## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SMO, INC.,<br>a Maryland corporation<br>La Plata, Maryland, | ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| KHALID JAMIL,<br>Newark, Delaware, | ) ) ) | JURY TRIAL DEMANDED |
| *Defendant*. | ) ) | |

### COMPLAINT

Plaintiff SMO Inc. ("SMO" or "Plaintiff"), by and through the undersigned counsel, hereby alleges as follows:

### NATURE OF THE ACTION

1.    This is a civil action seeking damages for breach of contract, fraud and conversion, arising from Defendant's lease of the service station and purchase of petroleum products from the Plaintiff SMO.

### THE PARTIES

2.    Plaintiff is a corporation organized under the laws of the state of Maryland with a principal place of business located in LaPlata, Maryland.

WL: #179735 v1 (3%_N01!.DOC)

3.    Defendant Khalid Jamil ("Jamil" or "Defendant") is an individual domiciled in the state of Delaware, and residing at 1102 Richfield Road, Newark, Delaware.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction pursuant to 28 U.S.C. §1332 in that there is complete diversity jurisdiction between Plaintiff and the Defendant and the amount in controversy exceeds $75,000, exclusive of interests or costs.

5.    This Court has personal jurisdiction over the Defendant, and venue in this District is proper under 28 U.S.C. § 1391, in that the Defendant resides in the District, and the acts complained of occurred in this District.

## BACKGROUND FACTS

### The Relevant Contracts

6.    SMO entered a Purchase and Sale Agreement with Jamil, to sell petroleum products, effective May 1, 2003 (the "Purchase Agreement"). A true and correct copy of the Purchase Agreement is attached as Exhibit "A".

7.    SMO leased the premises located at 804 South College Avenue in Newark, Delaware ("Service Station") to Jamil, d/b/a College Avenue Shell, pursuant to a Retail Facility Lease, effective May 1, 2003 (the "Lease Agreement"). A true and correct copy of the Lease Agreement is attached as Exhibit "B".

8.    SMO entered an Addendum Agreement with Jamil, effective May 1, 2003. A true and correct copy of the Addendum Agreement is attached as Exhibit "C".

-2-

**Defendant Repeatedly Violates the Purchase and Lease Agreements**

9.    A representative from SMO ("SMO Representative") inspected the Service Station on February 16, 2004, and found overgrown weeds surrounding the premises and excessive cars being stored on the premises. The SMO Representative informed Jamil of these conditions and Jamil assured the SMO representative that he would resolve the image and appearance problems with the Service Station.

10.    The SMO Representative inspected the Service Station on March 19, 2004, again finding overgrown weeds surrounding the premises and excessive cars being stored on the premises. The SMO Representative informed Jamil of these conditions and Jamil assured the SMO representative that he would resolve the image and appearance problems with the Service Station.

11.    The SMO Representative inspected the Service Station on April 22, 2004, again finding overgrown weeds surrounding the premises and excessive cars being stored on the premises. The SMO Representative informed Jamil of these conditions and Jamil assured the SMO representative that he would resolve the image and appearance problems with the Service Station.

12.    The SMO Representative inspected the Service Station on May 20, 2004, again finding overgrown weeds surrounding the premises and excessive cars being stored on the premises. The SMO Representative informed Jamil of these conditions and Jamil assured the

SMO representative that he would resolve the image and appearance problems with the Service Station.

13.     The SMO Representative inspected the Service Station on June 29, 2004, again finding overgrown weeds surrounding the premises and excessive cars being stored on the premises. The SMO Representative informed Jamil of these conditions and Jamil assured the SMO representative that he would resolve the image and appearance problems with the Service Station.

14.     The SMO Representative inspected the Service Station on July 7, 2004, again finding overgrown weeds surrounding the premises and excessive cars being stored on the premises. The SMO Representative informed Jamil of these conditions and Jamil assured the SMO representative that he would resolve the image and appearance problems with the Service Station.

15.     From the time of the SMO Representative's first inspection on March 19, 2004 up to and including July 7, 2004, despite repeatedly receiving verbal notification of the image and appearance problems with the Service Station, Jamil did not take any action to resolve the problems.

16.     On July 19, 2004, the SMO Representative notified Jamil, in writing, that his failure to resolve the image and appearance problems with the Service Station violated Section 7(b), page 6 of the Purchase Agreement. A true and correct copy of the July 19, 2004 Letter is attached as Exhibit "D".

WL: #179735 v1 (3%_N01!.DOC)

17.    On August 4 and August 11, 2005, during additional site inspections, the SMO Representative again identified overgrown weeds surrounding the premises and excessive cars being stored on the premises.

18.    In addition, the SMO Representative observed a series of dead pine trees planted in front of the Service Station and requested that Jamil replace or remove the trees.

19.    On August 19, 2005, the SMO Representative notified Jamil, in writing, that his failure to resolve the image and appearance problems with the Service Station violated Section 7(b), page 6 of the Purchase Agreement. A true and correct copy of the August 19, 2005 Letter is attached as Exhibit "E".

20.    On August 11, 2005, during an early morning site inspection of the Service Station, the SMO Representative noticed that the Service Station opened at 7:10 am when it should have opened at 6 am, per page 3 of the Lease Agreement.

21.    On August 19, 2005, the SMO Representative notified Jamil, in writing, that his failure to open the Service Station on time violated the terms of the Lease Agreement. A true and correct copy of the (Second) August 19, 2005 Letter is attached as Exhibit "F".

22.    On October 28, 2005, a representative of Shell Corporation ("Shell") performed an inspection of the Service Station and identified the failure of numerous Service Station employees to wear name tags and proper uniforms.

23.    On November 1, 2005, the SMO Representative notified Jamil, in writing, of Shell's findings, that Jamil's constant failure to have his Service Station employees wear the

-5-

proper attire violated the image and appearance guidelines in Section 7(f), page 6 of the Purchase Agreement.  A true and correct copy of the November 1, 2005 Letter is attached as Exhibit "G".

## SMO Exercises Its Right To Terminate The Agreements

24.     On November 1, 2005, Jamil signed a Mutual Termination Agreement And General Release Agreement, effective the start of business on December 1, 2005 (the "Termination Agreement").  A true and correct copy of the Termination Agreement is attached as Exhibit "H".

25.     The Termination Agreement provided for the termination of the Purchase Agreement and the Lease Agreement between SMO and Jamil pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq..  The Termination was to take effect on December 1, 2005.

26.     The Termination Agreement also provided that Jamil must pay all outstanding debts to SMO in full prior to termination.

27.     Independent of the Termination Agreement, the Purchase Agreement, section 35(b)(iv), page 20, permits SMO to terminate the Purchase Agreement upon the failure of Jamil to make a timely payment for petroleum products.  The Purchase Agreement, section 31, page 19, also provides for the payment of the attorney's fees of SMO to bring its claim against Jamil for breach of the Purchase Agreement.

28.     Independent of the Termination Agreement, the Lease Agreement, section 19, page 18, also permits SMO to terminate the Lease Agreement upon Jamil's breach of the

-6-

Purchase Agreement. The Lease Agreement, section 28, page 21, also provides for the payment of SMO's attorney's fees to bring its claim against Jamil for breach of the Lease Agreement.

## After Signing The Termination Agreement, Defendant Receives Petroleum Products And Intentionally Fails to Make Payments

29.     With the knowledge that on December 1, 2005, his rights in the Lease and Purchase Agreements would be terminated, Jamil intentionally and purposely stopped payments and even reversed payments in November 2005 for deliveries of petroleum products in order to defraud and convert the property of SMO.

30.     Pursuant to the Purchase Agreement, section 3, page 4, Jamil authorized SMO to receive payment from his bank account, via Electronic Funds Transfers ("EFT"), upon delivery of petroleum products to the Service Station.

31.     Despite receiving petroleum from SMO on November 2, 2005, Jamil placed a stop payment on an EFT in the amount of $19,402.66.

32.     On November 9, 2005, Jamil assured the SMO Representative, upon inquiry, that he would provide a certified check on November 10, 2005, to pay for the November 2, 2005 delivery.

33.     On November 10, 2005, the SMO Representative learned that Jamil had reversed two previously authorized payments of $21,194.16 and $20,296.99, for petroleum deliveries made on October 21, 2005 and October 27, 2005, respectively.

-7-

34.    On November 10, 2005, Jamil assured the SMO Representative, upon inquiry, that he would provide a certified check to SMO on November 11, 2005, to pay for the October 21, 2005, October 27, 2005 and November 2, 2005 deliveries.

35.    On November 11, 2005, having failed to satisfy his November 10 assurance, Jamil again assured the SMO Representative that he would provide a certified check on November 12, 2005, to pay for the October 21, 2005, October 27, 2005 and November 2, 2005 deliveries.

36.    On November 12, 2005, the SMO Representative attempted twice to contact Jamil, but he was not available.

37.    On November 15, 2005, the SMO Representative learned that Jamil had placed additional stop payments for various deliveries made in early November in the amounts of $19,623.07, $19,404.58 and $19,902.29.

38.    On November 15, 2005, the SMO Representative learned that Jamil had insufficient funds to pay for deliveries of petroleum made in early November in the amounts of $15,107.28 and $18,230.32.

**Jamil Misappropriates Funds Due SMO**

39.    On or about November 9, 2005, after learning that Jamil was failing to or reversing payments to SMO for previously delivered petroleum, SMO requested that Shell direct proceeds from each credit card purchase at the Service Station to SMO.

-8-

40.    In October or November of 2005, Jamil acquired his own credit card processing machine in violation of section 13 of the Purchase Agreement, and directed proceeds from each credit card purchase at the Service Station to his own personal bank account, in order to purposely frustrate SMO's collection attempts.

41.    In addition, after having failed to make several payments to SMO and improperly reversing other payments, and deceiving the SMO Representative into believing that payments were forthcoming, Jamil ordered and filled all available petroleum storage containers at the Service Station, knowing that he would not pay for the petroleum products.

42.    Upon inquiry into his non-payments, on November 15, 2005, Jamil stated to an SMO Representative that he would not pay SMO for the petroleum SMO had delivered in October and November of 2005.

43.    As a consequence, on November 15, 2005, instead of waiting for the December 1 effective date referenced in the Termination Agreement, and in an attempt to mitigate damages, SMO notified Jamil, in writing, of the immediate termination of his Purchase and Lease Agreements pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq*. A true and correct copy of the Termination Letter is attached as Exhibit "I".

44.    At the time of the termination of the Purchase and Lease Agreements, Jamil owed $176.42 to Delmarva Power for natural gas usage and $377.80 to the City of Newark for water usage at the Service Station. Jamil was obligated to pay these utility charges under

both the Lease and Termination Agreements. As a result of Jamil's failure to pay these utility charges, SMO, as the owner of the Service Station, was forced to pay the charges.

45.    Thereafter, on November 16, 2005, the SMO representative learned that Jamil had insufficient funds to pay for another November delivery of petroleum in the amount of $19,085.26.

46.    On November 16, 2005, the SMO representative learned that Jamil had placed additional stop payments for deliveries of petroleum made in early November in the amounts of $2,174.71 and $17,168.15.

### Count I – Breach of Contract (Purchase Agreement)

47.    SMO repeats and realleges the foregoing allegations contained in the above paragraphs as if fully set forth herein.

48.    The Purchase Agreement between SMO and Jamil was an enforceable contract.

49.    The Purchase Agreement was the product of an offer and acceptance, mutual assent, and an exchange of valid consideration.

50.    The Purchase Agreement contains specific terms that determine the obligations of the parties. SMO complied with all of its obligations under the Purchase Agreement.

WL: #179735 v1 (3%_N01!.DOC)

51.     The Purchase Agreement required Jamil to provide SMO with payment for the delivery of petroleum products in a timely manner.

52.     Jamil's failure to make payments for petroleum products was a material breach of the Purchase Agreement, and constitutes an event that is relevant to the franchise under the PMPA, 15 U.S.C. § 2802(b)(2)(C) and §2802(c)(8), which is incorporated in the Purchase Agreement, authorizing SMO to terminate the Purchase Agreement with Jamil.

53.     SMO has suffered direct, actual, incidental, and consequential damages as a result of the material breach of the Purchase Agreement by Jamil.

54.     SMO is also entitled to attorney's fees to prosecute its claim for breach of contract under section 31, page 19 of the Purchase Agreement.

## Count II – Breach of Contract (Lease Agreement)

55.     SMO repeats and realleges the foregoing allegations contained in the above paragraphs as if fully set forth herein.

56.     The Lease Agreement between SMO and Jamil was an enforceable contract.

57.     The Lease Agreement was the product of an offer and acceptance, mutual assent, and an exchange of valid consideration.

58.     The Lease Agreement contains specific terms that determine the obligations of the parties.  SMO complied with all of its obligations under the Lease Agreement.

59.    The Lease Agreement required Jamil to maintain the Service Station premises in good condition and prohibited the use of the premises as storage space for motor vehicles.

60.    The Lease Agreement required Jamil to pay rent to SMO while operating the Service Station, and to pay for utilities, such as natural gas and water usage charges.

61.    Jamil's failure to adequately maintain the premises, and his failure to pay rent to SMO and to pay for utility charges were material breaches of the Lease Agreement, and constitute events that are  relevant to the franchise under the PMPA, 15 U.S.C. § 2802(b)(2)(C) and §2802(c)(8), authorizing SMO to terminate the Lease Agreement with Jamil.

62.    SMO has suffered direct, actual, incidental, and consequential damages as a result of the material breach of the Lease Agreement by Jamil.

63.    SMO is also entitled to attorney's fees to prosecute its claim for breach of contract under section 28, page 21 of the Lease Agreement.

### Count III - Breach of Contract (Termination Agreement)

64.    SMO repeats and realleges the foregoing allegations contained in the above paragraphs as if fully set forth herein.

65.    The Termination Agreement between SMO and Jamil was an enforceable contract.

-12-

66.    The Termination Agreement was the product of an offer and acceptance, mutual assent, and an exchange of valid consideration.

67.    The Termination Agreement contains specific terms that determine the obligations of the parties.  SMO complied with all of its obligations under the Termination Agreement.

68.    The Termination Agreement required Jamil to pay all outstanding obligations and debts owed to SMO prior to the effective date of the termination.

69.    Jamil's failure to pay the obligations and debts was a material breach of the Termination Agreement.

70.    SMO has suffered direct, actual, incidental, and consequential damages as a result of the material breach of the Termination Agreement by Jamil.

## Count IV – Fraud

71.    SMO repeats and realleges the foregoing allegations contained in the above paragraphs as if fully set forth herein.

72.    Jamil made false representations to SMO by stating to the SMO representative that he would provide payment for deliveries of petroleum products made in October and November of 2005.

73.    Jamil knew his representations were false or made with reckless indifference to the truth because he continued to stop payments or reverse previously authorized

-13-

EFTs at the same time he was making assurances to the SMO Representative that he would make payments for past deliveries of petroleum products.

74.    Jamil intentionally induced SMO to refrain from terminating the Purchase Agreement and Lease Agreement or otherwise, to have SMO continue making petroleum deliveries to the Service Station. This intent was evidenced by falsely assuring SMO that Jamil would make payments while he simultaneously stopped (or reversed) EFT payments to SMO.

75.    SMO relied on Jamil's false representations to make payments (which he did not intend to make) for the deliveries of petroleum products, inducing SMO to continue to fill the Service Station tanks with petroleum in November.

76.    SMO suffered compensatory damages and is entitled to an award of punitive damages as a result of Jamil's fraudulent inducement.

### Count V- Conversion

77.    SMO repeats and realleges the foregoing allegations contained in the above paragraphs as if fully set forth herein.

78.    SMO had a property interest in the petroleum products it delivered to the Service Station.

79.    SMO had a right to the possession of the petroleum products that were delivered to the Service Station because Jamil never intended to pay for the petroleum products.

-14-

80.     Jamil acquired his own credit card processing machine and siphoned proceeds from the sale of petroleum products supplied by SMO to the Service Station into his own personal bank account to prevent SMO from collecting payments for deliveries of petroleum products.

81.     Jamil ordered and received additional deliveries of petroleum products from SMO with the intent of never paying for those additional deliveries.

82.     Jamil converted petroleum products, in which SMO had a legal and equitable interest, into personal funds.

WL: #179735 v1 (3%_N01!.DOC)

83.    SMO suffered compensatory damages, and is entitled to an award of

punitive damages as a result of Jamil's conversion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SMO, Inc. prays for a judgment against the Defendant Khalid

Jamil for the following:

a.    direct, actual, incidental, consequential, compensatory, and punitive damages; prejudgment interest;

b.    costs;

c.    attorney's fees pursuant to section 28, page 21 of the Lease Agreement and section 21, page 14 of the Purchase Agreement; and

d.    such other and further relief as the Court may deem just and proper.

Dated: December 7, 2005

_____
Albert H. Manwaring, IV (#4339)
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Tel: (302) 777-6514
Fax: (302) 421-8390
Manwaringa@pepperlaw.com

Attorney for Plaintiff SMO, Inc.

# EXHIBIT "A"

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT is effective **May 1ˢᵗ, 2003** ("Effective Date") between SMO, Inc. ("Seller") whose address is P.O. Box 2810, LaPlata, MD 20646 and **Khalid Jamil** ("Retailer") whose address is **804 South College Avenue, Newark, DE 19713**.

This Agreement is comprised to two parts. Part I sets forth the variable provisions of this Agreement and references the applicable articles in PART II that sets forth the general provisions. To the extent there is a conflict between PART I and PART II, the provisions in PART I are controlling.

## PART I

**Special Legend for Retailers in Delaware and Maine:**

PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. A SERVICE STATION DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE, WHICH HE OR SHE ALONE MAY DECIDE.

<u>Article No.</u>

1(c)    Designated brand Identification: **SHELL**

1(h)    Retailer's Station is located at: **804 South College Avenue, Newark, DE 19713**.

2    Product quantities:

### MINIMUM PRODUCT QUANTITIES
(in thousands of gallons)

| PRODUCT | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| PETROLEUM | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

PETROLEUM: 1,440,000 gallons per year

4    This Agreement begins on the effective date specified above and expires **three (3)** years from the 1ˢᵗ day of the first full month following the Effective Date ("Expiration Date").

5    Motor Fuel Dispensing Station___ or Automotive Service Station ✓ [Delete one ✓ ].

7(h)    Except for Retailers in Delaware and the District of Columbia:

Hours of Operation:  At least 24 hours each day 12:00 A.M. to 11:59 P.M.

27(b)    Key Management Person designated for Retailer if Retailer is a Business Entity or joint Retailer

JAMIL R. KHAN

NOTE TO RETAILER:  BE SURE YOU READ AND UNDERSTAND ALL OF THE PROVISION OF PART I AND PART II OF THIS AGREEMENT BEFORE YOU SIGN BELOW.

Executed on the date shown below

**Khalid Jamil**

[Retailer]

By: _____

Khalid Jamil

Title: __OMER__ .

Date: __4/28/03__

**SMO, Inc.**

[Seller]

By: _____

John R. Binette

Title: President _____

Date: __5/12/03__

# PART II

1.    **DEFINITIONS.** As used in this Agreement, the terms below have the following meanings, whether singular or plural:

    a.    "Agreement" —— This Purchase and Sale Agreement between Retailer and Seller.

    b.    "Alteration"— Any addition, modification, removal, or replacement of any building, structure, improvement or equipment at Retailer's Station.

    c.    "Business Entity"—Any legal entity that is not an individual or sole proprietorship, including, without limitation, a partnership, corporation, limited liability company, limited liability partnership, or association.

    d.    "Identifications"— Those trademarks, trade dress, service marks, color schemes, brand names and other brand identifications of the brand designated in PART I for which the Seller grants to Retailer the right of use at Retailer's Station in connection with the resale of Products under the terms of this Agreement.

    e.    "Law"—Any applicable constitution, statute, ordinance, regulation, rule, administrative order, or other requirement of any federal, state, or local government agency or authority in effect at the time of execution, or during the term, of this Agreement.

    f.    "Products"—The gasoline and diesel sold to Retailer by Seller for resale under the brand Identification designated by Seller in Part I.

    g.    "PMPA"—The Petroleum Marketing Practices Act as may be amended from time to time (15 U.S.C.§2801 et seq.).

    h.    "Retailer's Station"—The motor fuel dispensing station or automobile service station, as the case may be, and associated facilities located at the address indicated in PART I and operated by Retailer under this Agreement for those authorized uses identified in Article 5.

    i.    "Retail Facility Lease" —— The Retail Facility Lease entered into between the parties hereto contemporaneously with this Agreement.

    j.    "Supplier" —— Seller's supplier of motor fuel and owner of the brand designation identified in Part I of this Agreement.

    k.    "Terminal" —— The terminal from which deliveries of Products are made to Retailer.

2.    **QUANTITIES.**

    a.    Retailer shall purchase all its motor fuel requirements for the Retailer's Station, but in no case less than the annual minimum quantities of the Products set forth in Part I and shall purchase during each quarter-of-a-year no less than twenty-five percent (25%) of the minimum annual quantity of each product listed. The term "quarter-of-a-year" shall mean any consecutive three-month period during the Agreement year. Failure to purchase the quarterly minimum is a breach of this Agreement.

    b.    Retailer agrees that if the Retailer fails to meet the aggregate volume of product purchase requirements stipulated above and monitored on a quarterly basis, Seller shall have, at its sole discretion and in addition to any other available remedies, any of the following options:

    (1)    Collect liquidated damages in an amount equal to two cents (2¢) per gallon multiplied by the difference between the minimum purchase requirements and the actual purchases for the quarter; or

    (2)    May establish "good faith purchase amounts" for the following quarter that would cure existing the breach; or

    (3)    Terminate this Agreement.

c.    If Retailer fails to cure any breach as set forth in subparagraph (a) or fails to pay the liquidated damages stated in subparagraph (b) within ten (10) days after receiving written notice from Seller, Seller may terminate this Agreement.

d.    Any other products purchased by Retailer from Seller, shall be covered by the applicable terms and conditions under this Agreement.

e.    Retailer agrees that the minimum quantities of products set forth in the Agreement are subject to change by Seller, in its own discretion, on an annual basis, provided however that the minimum quantity for any year may not be set at less than eighty percent (80%) of the actual number of gallons purchased by Retailer during the previous year and the maximum quantity for any year.

## 3.    PRICES AND TERMS OF PAYMENT.

a.    Retailer shall pay Seller's price in effect at the time loading commences at the Terminal to like dealers of the same class in the same competitive market for the particular Product. Retailer may ascertain Seller's current prices on the Web or at such other place designated by Seller. Prices are subject to change without notice to Retailer.

b.    Retailer shall pay for the Products in accordance with Seller's payment terms in effect from time to time, any of which may be revoked by Seller with reasonable notification to Retailer. If Seller elects to extend credit to Retailer, Retailer shall comply with Seller's credit terms in effect from time to time, any of which may be altered or revoked by Seller without prior notification to Retailer. Retailer agrees to pay at the time of delivery via Electronic Fund Transfer ("EFT") (or at Seller's option, cash, certified or cashier's check, money order, Automated Direct Debit System, or other means approved by Seller) for all goods delivered to Retailer by Seller under the terms of this Agreement except deliveries for which credit has been previously arranged in writing with Seller. Purchases made and not paid for on delivery shall be payable at Seller's principal office unless otherwise specified by Seller. Seller, in its sole discretion may require Retailer (i) to pay Seller via wire transfer prior to time of delivery or at such a time and place or method as Seller may designate from time to time, (iii) to provide Seller a cash deposit, or (iii) to provide Seller an Irrevocable Bank Letter of Credit sufficient to Seller in form and amount. Retailer shall provide any written authorizations required for EFT purposes. Upon Seller's request, Retailer shall provide Seller with information and documents relating to Retailer's financial condition and creditworthiness. In order to secure payment of all Retailer's present and future indebtedness owed by Retailer to Seller at any time during the term of this Agreement or upon its termination or expiration and to secure Products sold to Retailer on credit, Retailer hereby grants to Seller a security interest and/or a purchase money security interest in (i) all of Retailer's inventory of petroleum products and tires, batteries and accessories ("TBA") purchased from Seller, regardless of when purchased, (ii) all accounts receivable owing to Retailer regardless of when or how incurred, (iii) all of Retailer's equipment purchased from Seller, and (iv) all proceeds of Retailer's inventory, accounts receivable and equipment. Retailer agrees to sign all financing statements and renewals as necessary to provide public record of this security interest. In the event of insolvency of Retailer, assignment for benefit of creditors, the

institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against Retailer, or failure of Retailer to perform any of the obligations of payment in accordance with the terms of payment established by Seller from time to time, Seller shall have the option without notice or demand upon Retailer to declare an event of default under the Uniform Commercial Code, and upon any such default, Seller may declare all of Retailer's indebtedness to Seller immediately due and payable. Thereafter Seller may proceed to enforce payment and may exercise any and all rights available to it. **In addition, Seller reserves the right to require a security deposit, letter of credit, or personal guaranty in accordance with Seller's Retailer Security Policy in effect from time to time.**

c.  Seller may assess a reasonable administrative fee upon Retailer for payments that are returned or rejected for lack of sufficient funds or for any other reason within Retailer's control. All overdue sums owed to Seller will bear interest at the maximum lawful rate per annum from the date due until paid. Further, if Retailer fails to make timely payment of any amount due Seller, in addition to all other rights or remedies available, Seller may take such action as Seller deems reasonable under the circumstances. Without limiting the generality of the foregoing, Seller may (i) set off or equitably recoup against any amount then due Retailer, (ii) defer further deliveries of the Products until payment of all outstanding indebtedness is made, or (iii) demand advance cash payment for further deliveries. Retailer shall comply with the terms of any reclamation notice issued to Retailer by Seller under applicable Law.

d.  If, in response to request by Retailer, Seller elects in its sole discretion to waive the full transport delivery provision of this Agreement and agrees to deliver to Retailer in less-than-full transport load, Retailer may be required to pay a split-load fee at option of Seller, in addition to other charges.

4.  **TERM.** The term of this Agreement is identified in Part I and shall be coextensive with the term of the Retail Facility Lease between the parties executed on **May 1ˢᵗ, 2003** and any other extensions or renewals thereof. If for any lawful reason, the accompanying Retail Facility Lease is terminated or not renewed, then this Agreement shall also terminate or not be renewed at the time of the termination or nonrenewal of the Retail Facility Lease.

5.  **USE AND FAILURE TO MAINTAIN PLACE OF BUSINESS.**

a.  Retailer shall use Retailer's Station solely for the operation of a motor fuel dispensing station and, if approved by Seller in PART I, an automobile service station or convenience store, and those associated facilities for the uses authorized by Seller in Exhibit A. Retailer must obtain Seller's prior written consent to use Retailer's Station for any use not authorized under this article.

b.  If approved by Seller for use as an automobile service station, Retailer's authorized use includes only minor repairs and services to motor vehicles. For the purpose of this article, "minor repairs and services" excludes major repairs and replacements, which major repairs and replacements include, but are not limited to, (i) engine replacement or engine repair involving removal of the engine; (ii) automatic transmission/transaxle replacement or repair and manual transmission/transaxle repair; (iii) differential assembly replacement or repair, and (iv) fender and body repair. Seller may modify this description of major repairs and services from time to time consistent with evolving industry practice and shall provide written notice to Retailer of such modification.

c.  Retailer shall maintain at the Retailer's Station at all times quantities of all grades of Products and, if applicable, stocks of inventory items customarily offered for sale at first class convenience stores sufficient to meet customer demands.

    d.   Retailer shall maintain Retailer's Station in accordance with Seller's motor fuel station and associated facilities standards and specifications, established by Seller from time to time, including, but not limited to, those relating to architectural design, style, color scheme, and layout. If Seller changes these standards and specifications, Seller shall provide Retailer with written notice. Retailer shall not make any Alteration to Retailer's Station, or construct any additional buildings or structures, without Seller's prior written consent.

6.      **PERMISSION TO USE THE IDENTIFICATIONS.** Retailer agrees and understands that Seller is not the licensee of the Identifications, and that Seller has been granted the right to grant to Retailer the right to use the Identifications only in connection with the storage, handling, marketing, distribution, and resale of the Products, provided that Retailer complies with the terms of this Agreement and Supplier's image, appearance, and operating standards and requirements, including, without limitation, the following requirements relating to the marketing, storage, and resale of the Products.

    a.   Retailer shall strictly maintain the quality of all Products and shall not adulterate, commingle, or blend the Products with any other products or substances in any manner.

    b.   Retailer shall clearly identify and correctly label all Products under their proper brand names, designations, and grades.

    c.   Retailer shall not use the brand designation in Part I as part of Retailer's Business Entity name. Retailer shall not use the Identifications or the brand designation in Part I in Retailer's trade style if the use is likely to: (i) create the impression that Retailer's business is owned or operated by Seller or (ii) deceive or cause a likelihood of confusion to prospective customers.

    d.   All equipment, signs and other advertising devices or materials furnished by Seller to Retailer, more fully described at Exhibit B attached hereto, will remain Seller's property, must be used solely in connection with Retailer's sale of the Products, and must be returned to Seller immediately upon demand at Retailer's expense.

    e.   Retailer shall obtain Seller's prior written approval before using any promotional materials or advertising bearing any of the identifications.

    f.   Retailer agrees that products received from others besides Seller will not be stored, marketed, sold, dispensed, or distributed by Retailer under any Identifications permitted for Retailer's use at the Retail Station by Seller or commingled with any product supplied by Seller. Seller shall have the right to substitute the trade names, trademarks, brand names or other brand identifications owned by another supplier of Seller ("Substituted Identifications") for the Supplier's Identification. Retailer shall comply with the any and all terms and conditions that supplier of the Substituted Identifications may require for the use thereof. In the event of such substitution, all references herein to the term "Supplier" shall be understood and deemed to mean the supplier of the Substituted Identifications and all references to "Identifications" shall be understood and deemed to mean the Substituted Identifications. Retailer agrees that during the effective period of this Agreement, Seller, at its sole discretion, may enter the Retailer's Station to install, or remove the Identifications permitted to be used in connection with the sale of Product covered by this Agreement. Upon termination, cancellation, or expiration of this Agreement (or prior thereto, upon demand by Seller), Retailer shall (i) discontinue the use, posting, mounting, display or other use of tradenames, and (ii) either deliver the Identifications to Seller at Seller's office or hold said Identifications at no charge for Seller to pick up.

7.    **BRAND IDENTIFICATION AND MINIMUM STANDARDS.** Retailer acknowledges that the Identifications represent to the motoring public the manufacture and sale of quality Products. Retailer further acknowledges that standards of quality and appearance of Seller and Supplier must be maintained at all stations displaying the Identifications in order to properly market and sell the Products, preserve and promote the reputation of Seller and Supplier, and achieve public acceptance of the Products. Accordingly, Retailer shall comply with all standards of operation and appearance established from time to time by Seller and Supplier, including, without limitation, the following minimum obligations; provided, however, the means and the manner of performance are within the sole discretion of Retailer:

    a.  Retailer shall diligently and efficiently merchandise and promote the Products at Retailer's Station. In merchandising the Products, Retailer shall fully consider using Supplier's latest merchandising planning guidelines provided to Retailer from time to time.

    b.  Retailer acknowledges receipt of Supplier's brand standards guidelines pertaining to Supplier's image, operations, and appearance standards ("Brand Guidelines"). At all times during the term of this Agreement, Retailer shall maintain Retailer's Station in accordance with the Brand Guidelines, as may be amended by Supplier from time to time.

    c.  Retailer shall personally and actively manage the business at Retailer's Station to assure good faith compliance with this Agreement and the Brand Guidelines.

    d.  Retailer shall conduct Retailer's operations at Retailer's Station in a professional and business-like manner and provide prompt, courteous, and efficient service to the public. Retailer shall promptly and courteously respond to any customer complaints (including written responses when appropriate) and take immediate action to satisfactorily resolve each customer complaint. If, in Seller's sole judgment, Retailer fails to adequately respond to and resolve customer inquiries or complaints, Seller may do so at Retailer's expense.

    e.  In order to operate Retailer's Station in an organized and efficient manner, Retailer shall maintain adequate and competent personnel who are able to converse in English with Seller, Retailer's customers, government officials, and other persons considering both the volumes and nature of the business activity.

    f.  Retailer and Retailer's employees shall wear neat, clean uniforms of a type and style approved by Seller.

    g.  Where a convenience store is authorized under this Agreement, Retailer shall (i) operate such convenience store as a first class convenience store; (ii) insure that all shelves are fully stocked with all inventory items customarily offered for sale at first class convenience stores sufficient to meet customer demands; (iii) insure that all equipment, including without limitations, coolers and other refrigerator appliances are in good operating condition; (iv) fully staff said convenience store with knowledgeable, courteous employees with the ability to communicate in the English language with law enforcement, fire, and government officials and other safety professionals; and (v) keep the convenience store open for business during the operating hours for the Retail Facility.

    h.  Retailer shall perform all authorized service work at Retailer's Station in a workmanlike manner utilizing only first-class new materials and parts except when the customer specifically authorizes rebuilt or used materials or parts.

    i.  Except for Retailers in Delaware and the District of Columbia, Retailer shall keep Retailer's Station open as an attended station for the sale of Products (unless Retailer receives Seller's prior consent to keep open as an unattended station, which consent may

be withheld consistent with applicable Law) during the hours and days of operation specified in PART I. Seller will adjust the hours of operation if required by Law.

    (1) Retailers in Delaware: Retailer shall keep Retailer's Station open during such hours each day and days each week as is necessary to assure that Retailer diligently and efficiently merchandises and promotes the sale of the Products, having due regard to prior practice, competitors' current practice, vehicular traffic patterns, customer convenience, availability of Products, and other customary criteria followed by Seller.

    (2) Retailers in the District of Columbia: Retailer shall keep Retailer's Station open during such hours each day and days each week as is necessary to assure that Retailer diligently and efficiently merchandises and promotes the sale of the Products, having due regard to prior practice, competitors' current practice, vehicular traffic patters, customer convenience, availability of Products and other customary criteria followed by Seller. In no event shall Retailer allow Retailer's Station to be closed for more than 18 days during any calendar year.

j.   Retailer shall not commit or permit any fraudulent or illegal act or activity at Retailer's Station or in connection with Retailer's performance under this Agreement.

k.   Retailer shall not permit the consumption of intoxicating beverages or use of illegal drugs at Retailer's Station.

l.   Retailer shall not keep animals at Retailer's Station.

m.   Retailer shall keep Retailer's Station, and the signs located at Retailer's Station, fully illuminated during the hours of operation.

n.   Retailer shall maintain Retailer's Station in a clean, sanitary, and safe condition and all property and equipment in good operating condition and repair. Retailer shall keep the driveways, sidewalks, and other landscaped areas in a neat and orderly appearance free from weeds, debris, snow, ice and rubbish. Retailer shall keep the public restrooms cleaned and stocked with necessary supplies and available during operating hours.

o.   Retailer shall not use Retailer's Station for any unlawful, offensive, hazardous, unsightly, or other objectionable purpose, including, but not limited to, the sale or display of materials with dominant themes of sex, nudity, prurient interest, or pornography. Retailer shall not display or offer for sale merchandise or paraphernalia that is morally offensive or distasteful to the general public.

p.   Retailer shall keep Retailer's Station clear of vehicles, other mobile equipment, and obstructions that restrict traffic flow, endanger customer safety, or detract from appearance. Retailer may not use Retailer's Station to sell, lease, park, or store motor vehicles, trailer, boats, or other mobile equipment, without Seller's prior written consent.

q.   Retailer may display signs necessary to identify the products and services offered and their prices provided the signs are displayed in a neat and orderly manner at Retailer's Station, are not affixed to the exterior of any building or the pole support(s) for the main Identification sign(s), and are briefly worded, professional-looking, and not handwritten. Retailer shall not display or use any other signs, posters, flags, pennants, or other advertising devices without Seller's prior written approval.

r.   Retailer shall not permit any form of gambling at the Retailer's Service Station. Retailer shall not install or replace any vending machine or equipment for merchandising sundry convenience items, or video or other game machine, without Seller's prior written consent.

s.  Retailer shall keep Retailer's Station free from loitering by persons who have no proper business purpose at Retailer's Station.

t.  Retailer shall operate and maintain Retailer's Station in a secure manner so that criminal activity is adequately deterred from occurring at Retailer's Station and all persons at Retailer's Station are adequately protected from injury, harm or loss.

u.  Retailer shall be given written notice of any failure to maintain these quality and appearance standards. Upon failure to correct said violations within thirty (30) days, (without prejudice to any other remedy available to Seller) Retailer, upon notice from Seller, will discontinue the use of the Identifications granted to Retailer by Seller. The discontinuance of the use of the Identifications shall not terminate or affect other obligations or terms of this Agreement. Upon the failure of Retailer to cure any violation of quality and appearance standards after notice and opportunity above, Seller at its sole discretion (without prejudice to any other remedy available to it) may enter and maintain or repair the Retailer's Store to bring the Retailer's Store up to the standards of quality and appearance listed herein. If Seller exercises this option, Retailer will reimburse Seller for the repair and maintenance done by Seller.

8.  **SELLER'S MARKETING RIGHTS.** Seller may, from time to time: (a) change the Identification applicable to any Product and require Alterations in accordance therewith; (b) add, change, or modify the grade, brand name, delivery package, or other distinctive designation of any Product; (c) change or modify the formulations and specifications of any Products; and (d) discontinue at any time the sale of any Product in which event the parties will be relieved of any further obligation with respect to that Product.

9.  **TRAINING.**

a.  Retailer or Retailer's Key Management Person shall attend and successfully complete any and all training courses that Seller or Supplier may require for the operation of an automobile service station, motor fuel dispensing station, and convenience store. Retailer may be required to pay the costs associated with the initial training, including costs for instructors, training materials, and the facility. Retailer shall arrange and pay for Retailer's or Retailer's Key Management Person's own transportation, lodging and food.

b.  After the initial training, Retailer or Retailer's Key Management Person shall attend a minimum of 3 days (24 hours) of Seller approved advanced or refresher training courses or courses deemed appropriate by local management for each year of the term of this Agreement. Retailer may be required to pay the costs associated with the additional training, including costs for instructors, training materials, and the facility. Retailer shall arrange and pay for Retailer's or Retailer's Key Management Person's own transportation, lodging, and food.

c.  Retailer shall execute Seller's or Supplier's training agreement prior to attending any training course. Upon Seller's or Supplier's request, Retailer shall furnish proof of Retailer's orientation and training for automobile service station, motor fuel dispensing station, and convenience store employees. Retailer shall have available and utilize training equipment, materials, and programs made available by Supplier from time to time for training purposes.

c.  To enhance the expeditious meeting of safety, health, operational and customer needs, Retailer understands that all training courses, programs, and tests offered by Supplier will be given only in the English language.

10.  **NON-EXCLUSIVE TERRITORY.** Nothing in this Agreement grants Retailer an exclusive territory to market and resell any Products. Seller reserves the right to market and sell, and

authorize others to market and sell, Products in any manner Seller chooses, including through its own retail outlets or through designated wholesalers or other retailers.

11.    **DELIVERIES.**

    a.  All Products will be sold F.O.B. destination (Retailer's Station). Title and risk of loss passes to Retailer when the Products pass the fill tube connection into Retailer's storage equipment. For Products sold F.O.B. origin, title and risk of loss passes to Retailer when the Products pass from Seller's delivery line into the receiving connection of the transportation equipment provided for Retailer's account.

    b.  Seller may make deliveries of the Products to Retailer's Station by any means of transportation. Retailer shall allow shipments in transport trucks provided by Seller to be unloaded immediately upon arrival. Retailer shall pay for any time in excess of the free unloading time for contract or common carriers as identified in the contract or tariff. Retailer will be allowed one hour of free time for unloading trucks owned or operated by Seller after which Retailer shall pay $25.00 per quarter hour until the shipment is unloaded.

    c.  Seller is not obligated to make any delivery outside of its usual business hours or in any quantity less than a full load. Retailer shall pay for any redistribution charges if Retailer, without justification, fails to accept all of any delivery by Seller.

    d.  Retailer will accept delivery of Products from Seller in full transport loads. Seller may deliver in less than full transport loads. Retailer will give Seller forty-eight (48) hours' notice for delivery, Sundays and holidays excluded. Retailer is responsible for inspecting the transport load or taking other measures to insure that the volume of Products ordered have been delivered. Any shortage shall be reported within twenty-four (24) hours of receipt of product for such claim to be considered. A defect in quality or other cause must be reported orally immediately upon reasonable suspicion thereof but no later than forty-eight (48) hours from receipt of product for such claim to be considered. Failure of Retailer to notify Seller in a timely manner shall operate as a waiver of any and all claims by Retailer for quantity and quality. Retailer agrees to make payment for all goods delivered to Retailer by Seller under the terms of this Agreement at the time of delivery or at such other time or place as the Seller, in its sole discretion, designates, and in the manner that Seller designates.

12.    **PRODUCT AND EQUIPMENT OBLIGATIONS.**

    a.  Retailer will keep adequate inventory control records, including but not limited to (1) recorded daily stick readings, (ii) gauge readings of storage equipment, and (iii) records of daily pump meter readings, to check for leaking or overflowing tanks, pumps, dispensers and pipe work connected thereto, and to check for the presence of water. Further, Retailer will take all actions and maintain all records required by Seller, Supplier, and applicable Laws to monitor the tank systems for any leaking or loss of fuel or to check for contamination or to take any actions and maintain any records otherwise reasonably required by Seller for such purposes. In addition to the other inventory reconciliation requirements of this Agreement, Retailer shall reconcile the inventory records for each underground storage tank located at the Retailer's Station pursuant to applicable Law so as to detect and otherwise prevent motor fuel releases, leaks, discharges and losses and shall on the fifth (5th) business day of each month, submit the results of the previous month's inventory reconciliation to Seller. Such inventory reconciliation shall comply with API Publication 1621 and all applicable Laws.

    b.  Retailer agrees to maintain adequately all storage facilities and dispensing facilities to prevent leaks, spills, and seepage. Retailer agrees to report all leaks immediately. In the

event of leakage, spills, inventory shortages, or seepage from storage, pumping, dispensing equipment or pipe work connected thereto, or of reasonable suspicion of such events, Retailer shall notify Seller orally immediately and subsequently to send Seller written notice within forty-eight (48) hours.

c.  Retailer agrees that it shall not use, dispense, or sell or cause to be used, dispensed, or sold liquid petroleum products that are contaminated.

d.  Retailer recognizes on behalf of itself, its employees, and those under its control, including but not limited to, customers at the Retailer's Store (hereinafter "Affiliates") that Retailer and the Affiliates are handling hazardous substances. Retailer agrees on behalf of itself and the Affiliates that in receiving, storing, handling, offering for sale, selling, delivering for use, exchanging in trade or using itself products purchased from Seller, Retailer will in all respects exercise the strictest care required by law that it will comply with any and all of Seller's equipment, Product handling, and reporting obligations set forth in this Agreement, as well as all applicable federal, state and local laws, ordinances, regulations, rules and orders, as exist now, or as may hereinafter come into force, including, but not limited to, those governing dispensing equipment, pollution, the maximum sulfur content of fuel, the maximum lead content of motor fuel, the requirements for oxygenated and reformulated fuel, the maximum RVP of motor fuel, the labeling of pump stands and dispensers of motor fuel, the use and labeling of product containers, the use, maintenance and labeling of product storage tanks, the prevention of spills, leaks, venting or other improper escape from product containers or storage tanks, and the method of clean up or disposal of a product which has leaked, spilled, vented, or otherwise improperly escaped from containers or storage tanks. Retailer understands that it is an "operator" for purposes of 40 C.F.R. 280-81 and any other applicable federal, state and/or local laws, regulations or ordinances related to the prevention of pollution from storage tanks or the taking of corrective action hereunder. RETAILER WILL INDEMNIFY AND HOLD SELLER, ITS SUCCESSORS AND ASSIGNS, HARMLESS AGAINST ALL LOSSES, CLAIMS, CAUSES OF ACTION, PENALTIES AND LIABILITIES ARISING OUT OF RETAILER'S FAILURE TO COMPLY WITH THIS SUBPARAGRAPH, and such failure shall entitle Seller to cancel this Agreement immediately.

e.  In the event that any spills, leaks, venting or other unintended discharges from product, containers, pumps, piping or storage tanks ("facilities") requires corrective action for any reason or cause, Seller is authorized to suspend immediately its supply and other obligations under this and related Agreements until such time as all required corrective action is completed and Seller is further authorized to enter the property at any time and remove all motor fuels from any and all storage tanks owned by Seller, and, in its sole discretion, remove storage tanks and related facilities owned by Seller shall be under no obligation to replace, repair or restore storage tanks pursuant to this provision and such suspension of obligations and/or removal of storage tanks shall not constitute fault hereunder or give rise to any claim for damages or other compensation. When all required corrective action is completed, Seller may demand a renegotiation of any term of this Agreement or related agreements, including the rental terms in any reasonable manner that compensates Seller for its out of pocket expenses and additional necessary investments occasioned by the discharge or restoration of this site.

13.  **TRANSACTION CARDS.**

a.  As long as Seller elects to accept specified credit cards, credit identifications, or other transaction authorization cards (collectively "Transaction Cards") in the state in which Retailer's Station is located, Retailer shall accept all Transaction Cards identified in

Supplier's Transaction Card guide ("Guide") for the purchase of authorized products and services. Retailer shall account for and process all such transactions in strict compliance with the terms set forth in the Guide, as may be amended by Supplier from time to time. Retailer shall pay any Transaction Card processing fee that may be assessed for providing such services.

b.   Seller shall accept from Retailer all transactions generated as a result of purchases made with authorized Transaction Cards and shall process such purchases in accordance with the terms in the Guide. At Seller's option, Seller shall pay the amount of the transactions to Retailer, after deducting any processing fee in effect under Supplier's then current Guide, by: (i) check to Retailer; (ii) a credit to Retailer's bank account by EFT; or (iii) setting off the amount against Retailer's account with Seller.

c.   For each transaction not authorized, disputed by a customer, or otherwise subject to charge back under the Guide, Seller may either charge the amount to Retailer's account or require Retailer to make immediate refund to Seller, including refund by draft or EFT initiated by Seller, without any deduction for any processing fee.

d.   Without limiting any rights or remedies available to Seller, if Retailer fails to comply with this article or the Guide, Seller may limit or terminate Retailer's right to participate in Supplier's Transaction Card program. Further, Supplier or Seller may alter, modify, amend, or terminate the Transaction Card program at any time upon notice to Retailer.

e.   Any credit cards that are charged back because of failure to comply with the then-current instructions and policies in the Guide or because of customer dispute will be the responsibility of the Retailer. Retailer agrees to be responsible for imprinters lent to it. In the event an imprinter is lost, stolen or damaged beyond repair, Retailer agrees to pay Three Hundred Twenty Five Dollars ($325.00) within thirty (30) days of receiving the bill for this amount.

14.   **INSPECTION AND AUDIT.** Supplier and Seller, their respective agents, and representatives may enter Retailer's Station, at all reasonable times, to inspect the facilities, procedures, and materials being used in the sale of the Products, to obtain samples thereof, and conduct tests on the Products, to inspect the books and records pertaining to the sale of Products, and to audit, observe, and otherwise verify Retailer's compliance with this Agreement.

15.   **TAXES.** Retailer shall pay all federal, state, and local taxes, excises, duties, and other assessments and charges of any kind and nature, now or hereafter levied ("Taxes") assessed by any governmental authority relating to the importation, manufacture, sale, purchase, transportation, storage, resale, or use of the Products insofar as the same is not expressly included in the price for the Products or other products. If Retailer pays directly any Tax normally remitted by Seller, Seller may require proof of payment of such charges from Retailer and may require Retailer to provide a bond or other form of security necessary to protect Seller against loss arising from nonpayment. Retailer shall furnish Seller with satisfactory Tax exemption certificates where an exemption is claimed.

16.   **WARRANTY AND DISCLAIMER.**

a.   Seller warrants that the Product(s) supplied hereunder will conform to the promises and affirmations of fact made in Seller's current technical literature and printed advertisements, if any, related specifically to such Product(s); that it will convey good title to the product(s) supplied hereunder, free of all liens, and that the product(s) supplied hereunder meet such specifications as have been expressly made a part of this Agreement. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL OR IMPLIED.

THE WARRANTY OF MERCHANTABILITY, IN OTHER RESPECTS THAN EXPRESSLY SET FORTH HEREIN, AND WARRANTY OF FITNESS FOR PARTICULAR PURPOSE, IN OTHER RESPECTS THAN EXPRESSLY SET FORTH HEREIN, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.

b.    Retailer warrants and represents as follows:

(i)  Retailer warrants that the entity that Retailer represents (proprietorship, partnership, or corporation) is authorized to grant the rights and assume the obligations it is undertaking under this Agreement.

(ii) Retailer warrants that Retailer has the authority to sign the Agreement on behalf of the proprietorship, partnership, or corporation, whichever is applicable.

(iii) Retailer will on request allow Seller to inspect such documents that verify the authorizations in subparagraphs b. (i) and b. (ii) of this Article.

(iv) Retailer warrants and agrees that Retailer is personally liable, bound to meet all obligations under this Agreement undertaken by Retailer, and is also personally liable for any breach of one or more of such obligations. The entity, if any, that Retailer represents, also remains so bound and so liable, jointly and severally with Retailer.

17.    **WAIVER.** Seller's right to require strict performance of the terms of this Agreement shall not be affected by any course of dealing or usage of trade. Nor shall such course of dealing or usage of trade be relevant to, consulted, or used to interpret the Parties' intent or construction of the terms of this Agreement, nor to negate the words of this Agreement. No waiver by either party of any breach of any of the covenants or conditions herein contained to be performed by the other party shall be construed as a waiver of any succeeding breach of the same or any other covenant or condition.

18.    **FORCE MAJEURE.**

a.    Seller need not meet any of its obligations under this Agreement and is not liable for losses or damages including, but not limited to, damages for loss of goodwill, special or consequential damages, or damages for failure to meet any of its obligations under this Agreement where its failure results from any cause substantially beyond its control, in the sole discretion of Seller, whether or not such cause is or was reasonably within the contemplation of the Parties. Where it is possible for Seller to remove or ameliorate such cause, as for instance in labor disturbances which could be settled by Seller's acceding to the demands of the labor group, Seller is not obligated to take measures to effect such removal or amelioration if such measures will involve substantial additional expense or a departure from Seller's normal practices. Without limitation of any other possible causes, compliance by Seller with any law, regulation, order, or request issued by any person, organization, agency, or department of any government or governmental authority with jurisdiction over Seller, Seller's assets, or Seller's operations, and acting under color of law shall constitute a cause substantially beyond Seller's control.

b.    Upon cessation of any cause and effects, identified in the previous subparagraph, performance hereof shall be resumed, but such failure or delay shall not operate to extend the term(s) of this Agreement nor obligate either Party of supply omitted performance.

c.    Nothing herein contained shall excuse Retailer from paying Seller, when due, any amounts payable hereunder or pursuant hereto.

d.    In the event any law, regulation, order or request (hereinafter referred to generally as legislation) issued by any person, organization, agency or department of any government or governmental authority with jurisdiction over Seller, Seller's assets, or Seller's

operation, and acting under color of law (hereinafter referred to generally as legislation) prohibits or alters Seller's ability to perform under this Agreement or makes necessary additional costs for Seller, the Seller at its sole discretion may terminate this Agreement at the effective date of the legislation or thereafter on thirty (30) days' notice to Retailer without incurring any liability for damages, including but not limited to goodwill.

19. **COMPLIANCE WITH LAWS.**

    a. Retailer shall comply with all Laws relating to the Retailer's Station and the business conducted thereon, including, but not limited to, those pertaining to environmental protection, safety, and health matters.

    b. Without limiting the generality of the foregoing, Retailer shall comply with all Laws, licenses and permits relating to unleaded gasoline, oxygenated gasoline, reformulated gasoline, Reid vapor pressure, fuel additives, and diesel fuel and other environmental requirements as specified in Exhibit C, as may be amended by Seller from time to time upon written notice to Retailer. Further, if Retailer owns or operates any UST system (as defined in applicable Laws), Retailer shall comply with all applicable Laws governing UST systems, including, but not limited to, financial responsibility requirements through mechanisms provided for in said Laws such as guarantees, surety bonds, and insurance.

20. **EXCUSES FOR NONPERFORMANCE.** Both parties will be excused from their obligations under this Agreement (except for financial obligations) to the extent that performance is delayed or prevented by any of the following matters: circumstances reasonably beyond the parties' control; fire, explosion, flood, ice storm, snowstorm, or earthquake, delay or loss of transportation or delivery equipment; mechanical breakdown; strikes or other labor trouble, plant shutdown, riots, or other civil disturbances; or voluntary or involuntary compliance with any Law or request of any governmental authority.

21. **INDEMNITY.**

    A. **TO THE EXTENT PERMITTED BY LAW, RETAILER SHALL NOT HOLD SELLER, ITS SUBSIDIARIES, AFFILIATES AND JOINT VENTURE PARTNERS, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS ("INDEMNIFIED PARTY") LIABLE FOR, AND SHALL INDEMNIFY AND DEFEND INDEMNIFIED PARTY AGAINST, ALL CLAIMS, DEMANDS, CAUSES OF ACTION, SUITS, DAMAGES, JUDGMENTS, LIENS, PENALTIES, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND LITIGATION COSTS, WHETHER INCURRED FOR AN INDEMNIFIED PARTY'S PRIMARY DEFENSE OR FOR ENFORCEMENT OF ITS INDEMNIFICATION RIGHTS (COLLECTIVELY, "CLAIM"), INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR HARM, INJURY, OR DEATH TO ANY PERSON, OR DAMAGE TO PROPERTY OR TO THE ENVIRONMENT ARISING OUT OF OR IN CONNECTION WITH ANY OF THE FOLLOWING MATTERS:**

        (1) **RETAILER'S PERFORMANCE OR NONPERFORMANCE UNDER THIS AGREEMENT;**

        (2) **ANY ACTION OR OMISSION OF RETAILER OR RETAILER'S EMPLOYEES, AGENTS, CONTRACTORS, ASSIGNS, OR THIRD PARTIES; AND**

        (3) **THE OPERATION OF RETAILER'S BUSINESS.**

    B. **RETAILER'S OBLIGATION TO INDEMNIFY AND DEFEND EXTENDS TO ANY CLAIM CAUSED BY THE CONCURRENT OR CONTRIBUTORY NEGLIGENCE OR FAULT OF ANY INDEMNIFIED PARTY BUT NOT TO**

ANY CLAIM SHOWN BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR ANY DEFECT IN THE PRODUCTS NOT CAUSED OR CONTRIBUTED TO BY ANY NEGLIGENCE.

C. WITHIN 24 HOURS AFTER THE OCCURRENCE OF WHICH MAY RESULT IN A CLAIM, RETAILER SHALL REPORT THE SAME TO SELLER BY TELEPHONE AND SHALL PROMPTLY THEREAFTER CONFIRM THE SAME BY WRITTEN NOTICE, INCLUDING ALL CIRCUMSTANCES THEREOF KNOW TO RETAILER O RETAILER'S EMPLOYEES.

D. PROMPTLY AFTER RECEIVING NOTICE, AT RETAILER'S EXPENSE, RETAILER SHALL INVESTIGATE, RESPOND TO, AND DEFEND ANY CLAIM ASSERTED AGAINST ANY INDEMNIFIED PARTY, INCLUDING, WITHOUT LIMITATION, ANY CLAIM ALLEGING THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE. THE INDEMNIFIED PARTY MAY PARTICIPATE IN THE DEFENSE AND SETTLEMENT OF ANY CLAIM OR LITIGATION WITH ATTORNEYS OF THE INDEMNIFIED PARTY'S SELECTION WITHOUT RELIEVING RETAILER OF ANY OBLIGATIONS UNDER THIS ARTICLE; PROVIDED, HOWEVER, THE INDEMNIFIED PARTY SHALL BE RESPONSIBLE FOR ITS OWN ATTORNEYS' FEES. SELLER SHALL REIMBURSE RETAILER FOR THE AMOUNT OF ANY JUDGMENT AND REASONABLE DEFENSE COSTS PAID BY RETAILER WHICH REPRESENTS THE INDEMNIFIED PARTY'S TOTAL LIABILITY FOUND BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR PRODUCT DEFECT AS SPECIFIED ABOVE.

E. ANY (i) REQUIREMENT UNDER THE ACCOMPANYING THE RETAIL FACILITY LEASE FOR THE RETAILER TO OBTAIN INSURANCE COVEREAGE OR (ii) OTHER INDEMNITY OBLIGATION CONTAINED IN THIS AGREEMENT OR IN SAID RETAIL FACILITY LEASE SHALL NOT LIMIT OR RESTRICT IN ANY WAY RETAILER'S OBLIGATIONS UNDER THIS ARTICLE.

F. RETAILER'S OBLIGATIONS UNDER THIS ARTICLE SHALL SURVIVE TERMINATION OR NONRENEWAL OF THIS AGREEMENT.

22. ASSIGNMENT SUCCESSORS AND ASSIGNEE

a. This Agreement is personal to Retailer. Retailer shall have no power to assign, transfer in any way including transfer upon retirement, mortgage, pledge, bequeath, or sell this Agreement, in whole or in part, directly or indirectly by operation of law or otherwise (all such possible actions hereinafter referred to as "Transfer"), without the prior written consent of Seller, which consent will not be unreasonably withheld. Such consent shall be required notwithstanding any decision by Seller to decline to exercise its right of first refusal as described more fully below. Retailer understands and agrees that such consent shall be subject to an evaluation of the prospective transferee as provided in paragraph 22(b) hereinbelow. Any attempts to Transfer this Agreement or any right under it, in whole or in part, directly or indirectly, without the Seller's prior written approval shall be null, void, invalid, and of no effect. A request for Seller's approval of Transfer shall be made in writing at least ninety (90) days prior to the date on which Retailer desires to make the Transfer. Seller will have ninety (90) days (or any lesser period specified by Law), after receipt of Retailer's request for consent to Transfer and all information

required to conduct the evaluation more fully described below to provide Retailer with written notice of its decision to grant or withhold its consent.

b.    Seller's consent to any request to Transfer Retailer's rights and obligations under this Agreement shall be subject to an evaluation of the ability of the prospective transferee to operate the Retailer's Station. Such evaluation shall consist of, without being limited to, an examination by Seller of the following factors or information concerning the prospective transferee to be provided to Seller: (i) business experience during the preceding five (5) years of the prospective transferee; (ii) description of any pollution or contamination of any kind, regardless of fault, that occurred or was discovered at any site at which the prospective transferee was an owner, employee, or operator; (iii) a financial statement of the prospective transferee for the preceding three (3) years; (iv) a copy of the proposed assignment agreement between the Retailer and the prospective transferee; (v) the business reputation of the prospective transferee; (vi) credit worthiness and reliability of the prospective transferee; and (vii) any other relevant information concerning the prospective transferee. Retailer shall cause the prospective transferee to provide Seller with all documents and information concerning the prospective transferee reasonably necessary to conduct such evaluation. Retailer agrees to reimburse Seller fee for the costs and expenses related to the evaluation of said transferee in an amount equal to ten percent (10%) of the difference between (i) amount that Retailer receives from the prospective transferee for the Retailer's business at the Retail Station and (ii) the purchase price paid by Retailer for Retailer's business at the Retail Station, except that such fee shall be in an amount that is no less than FIVE THOUSAND and No/100 DOLLARS ($5,000.00) and no more than FORTY THOUSAND and No/100 DOLLARS ($40,000.00). Retailer also agrees and understands that upon the Transfer of its rights and obligations hereunder, Retailer will remain obligated under this Agreement until written consent is given to the new retailer and the assignment agreement has been executed in full. Seller's consent to any Transfer is not a waiver of the terms of this Article 22 as to any subsequent Transfer.

c.    In addition to the requirement that the prospective transferee undergo an evaluation as provided hereinabove, the consent of Seller to any Transfer of Retailer's rights and obligations under this Agreement may be conditioned upon the agreement of the prospective transferee to enter into a trial franchise motor fuel supply agreement of one (1) year duration, pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U. S. C. Section 2803.

d.    It is mutually agreed that the terms and conditions of this Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto, their heirs, successors, and assigns, respectively.

## 23.    SELLER'S RIGHT OF FIRST REFUSAL

a.    If Retailer receives a bona fide offer from a third party to buy, lease, or otherwise for the conveyance or transfer all or any part of Retailer's interest in the Retailer's Business, which Retailer desires to accept, Retailer shall immediately notify Seller in writing (the "Notice") of the terms and provisions of the offer and shall include with such Notice a copy of said offer. Seller shall have the prior exclusive right ("Right of First Refusal") to buy, lease, or accept the conveyance or transfer of Retailer's interest in the Retailer's Business at the same price and on the same terms and conditions as contained in such offer. Seller shall have forty-five (45) days from the receipt of the Notice to notify Retailer in writing if it elects to exercise this Right of First Refusal. In the event that Seller fails to notify Retailer within said forty-five

(45) day period, Seller shall be deemed to have elected not to exercise said Right of First Refusal.

b.    If Seller elects to exercise said Right of First Refusal, Seller and Retailer shall execute a written agreement for the transfer of Retailer's interest in the Retailer's Business within thirty (30) days thereafter, and the transaction shall be closed as soon as reasonably practicable after the execution of said agreement.

c.    If Seller fails to exercise its Right of First Refusal and for any reason Retailer does not thereafter sell, lease, or otherwise transfer or convey its interest in the Retail Station to the third party making such offer at the price and upon the terms and conditions set forth in the Notice, Seller's Right of First Refusal shall continue in full force and apply with respect to any new offer from the third party or to an offer from another party for the Retail Station.

d.    If Seller fails to exercise the Right of First Refusal and Retailer accepts an offer from the third party to purchase, lease or otherwise accept the transfer or conveyance of Retailer's interest in the Retail Station, such offer shall be accepted by Retailer upon the same terms and conditions contained in the Notice. The sale, lease, transfer or conveyance of Retailer's interest in the Retail Station shall be subject to the terms and conditions of the Seller's Right of First Refusal hereunder. Said Right of First Refusal shall continue in effect and apply to all subsequent offers for the Retail Station thereafter received by said third party and its successors and assigns.

e.    Seller's Right of First Refusal shall continue in full force and effect for the term of the Agreement and any renewal terms thereof.

24.    **SUCCESSORS IN INTEREST.**  Where Retailer is not a Business Entity, Retailer may designate, in writing, a surviving spouse, adult child, stepchild, or parent of Retailer ("Designee") for Seller to consider accepting as a new franchisee in the event of Retailer's death, provided, (if permissible under applicable law) the Designee meets all the evaluation standards normally required by Seller for the assignment or transfer of Retailer's rights and obligations to a new franchisee as provided in Article 22(b) hereinabove. Retailer's designation revokes all prior designations, and will terminate upon termination, nonrenewal, or Transfer of this Agreement, upon Retailer's delivery to Seller of a written revocation or new designation, or upon Retailer's divorce from a designated spouse. If the Designee has been significantly involved in the Retailer's business at Retailer's Station (as reasonably determined by Seller) and meets all the standards normally required by Seller of a franchisee, Seller shall offer to enter into a new motor fuel sales agreement to replace this Agreement and lease agreement for the Retailer's Station constituting a franchise between the parties at Retailer's Station with the Designee on Seller's then-current terms and conditions; provided, however, Seller shall not be required to extend credit to the Designee without adequate security. If the Designee meets all of the standards normally required by Seller of a franchisee, but has not been significantly involved in Retailer's business at Retailer's Station (as reasonably determined by Seller), Seller shall offer to enter into a trial franchise agreement of one year, pursuant to the PMPA, 15 U.S.C. §2803, which franchise shall include a lease for the Retailer's Station and a new motor fuel supply agreement with the Designee; provided, however, that Seller shall not be required to extend credit to the Designee without adequate security.

25.    **INDEPENDENT CONTRACTOR.**  Retailer is an independent contractor and Seller has no right to exercise control or direction over any aspect of the Retailer's business or the operations conducted at Retailer's Station, including, but not limited to, the prices at which Retailer sells its

products. Nothing in this Agreement is intended to interfere with or diminish Retailer's complete control over and sole responsibility for the health, safety, and security matters at Retailer's Station. This Agreement does not establish any partnership, joint venture, employment, or agency between the parties or Retailer's employees or agents.

26. **BUSINESS ENTITY OR JOINT RETAILER.**

   a. If Retailer is comprised of more than one person, the obligations imposed under this Agreement the costs and expenses related to the evaluation of said transferee nt are joint and several as to each person and all of the terms apply to each person with the same effect as though that person were the sole Retailer.

   b. If Retailer is a Business Entity, all obligations and provisions of this Agreement of a personal nature apply as if the Business Entity were an individual and, insofar as is legally possible and reasonably practicable, to those individuals who have or exercise management responsibility for the Business Entity, including, without limitation, officers, directors or agents of corporations and partners of partnerships. The Business Entity must manage its affairs with respect to the personal obligations and provisions in a manner so as to give full force and effect to the same. Subject to Seller's prior written approval, if Retailer is a Business Entity, Retailer shall designate a Key Management Person as identified in PART I. Retailer may change Retailer's Key Management Person upon Seller's prior written approval. If Retailer's Key Management Person exercises primary management responsibility for Retailer's day-to-day operations, Seller may look to the Key Management Person in connection with performance of the personal obligations.

27. **ACTS ATTRIBUTABLE TO RETAILER.** The acts or omissions of Retailer's employees, agents, and contractors are the acts or omissions of Retailer. If Retailer is comprised of more than one person, the acts or omissions of each such person are the acts or omissions of Retailer. If Retailer is a Business Entity, in addition to those persons mentioned above, the acts or missions of the Key Management Person designated in PART I and of each partner, shareholder or member, as the case may be, are the acts or omissions of Retailer.

28. **NOTICES.**

   a. Except as otherwise specified in this Agreement, all notices must be in writing and in compliance with PMPA and other applicable Law. Subject o any requirements of Law, any notice may be given to Retailer by personal service or to either party by certified mail, regular mail, telegram facsimile, mailgram or overnight or local courier. Notice will be deemed given when: (i) deposited in the U.S. Mail, postage or charges pre-paid and directed to the party for whom intended at the address in this Agreement or such other address as directed by the party upon written notice to the other if given by certified mail or regular mail; (ii) deposited with the dispatching agency, postage or charges pre-paid and directed to the party for whom intended at the address in this Agreement or such other address as directed by the party upon written notice to the other if given by telegram, mailgram or overnight or local courier; or (iii) confirmation is received by the sending party if given by facsimile.

   b. If Retailer is a Business Entity, Seller may give notice to: (i) the Key Management Person; (ii) any officer or director of a corporation or limited liability company; (iii) any partner or a partnership or limited liability partnership; or (iv) any personal representative, agent, or employee of any other Business Entity.

29. **ALTERNATIVE DISPUTE RESOLUTION.** Except for an action brought by Seller to enforce a termination or nonrenewal of this Agreement, to protect the Identifications, or to collect indebtedness, if a dispute arises between the parties concerning their respective rights under this

Agreement, and where commercially reasonable and practicable, the parties shall seek to resolve the dispute by using an appropriate form of alternative dispute resolution prior to initiating litigation proceedings. If the parties are unable to reach resolution within 60 days following notice of a written claim, either party may initiate litigation proceedings. Except for an action brought by Seller to collect indebtedness, neither party, however, ay institute court proceedings against the other more than one year after the incident-giving rise to claim.

30.    **RELEASE. THE PARTIES RELEASE EACH OTHER, THEIR RESPECTIVE MEMBERS, SUBSIDIARIES, AFFILIATES AND JOINT VENTURE PARTNERS, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS AS OF THE EFFECTIVE DATE OF THIS AGREEMENT AND TO THE EXTENT PERMITTED BY LAW, FROM ALL CLAIMS WHICH EACH PARTY MAY HAVE AGAINST THE OTHER (WHETHER OR NOT NOW KNOWN), ARISING DIRECTLY OR INDIRECTLY OUT OF OR IN CONNECTION WITH ANY PRIOR AGREEMENT, EXCEPTING, HOWEVER, CLAIMS OF SELLER AGAINST RETAILER FOR INDEBTEDNESS, REIMBURSEMENT OR INDEMNIFICATION. RETAILER UNDERSTANDS THAT THIS RELEASE WAIVES ANY LIMITATION WITH REGARD TO A GENERAL RELEASE THAT MY EXIST UNDER THE APPLICABLE LAW AND THAT EVEN IF RETAILER OR SELLER SHOULD LATER BECOME AWARE OF A CLAIM ARISING OUT OF EVENTS OR CIRCUMSTANCES NOT NOW KNOWN OR SUSPECTED TO EXIST, RETAILER OR SELLER, AS THE CASE MAY BE, WILL NOT BE ABLE TO ASSERT SUCH CLAIM AGAINST THE OTHER.**

31.    **ATTORNEY'S FEES.** It is hereby agreed to and understood by the parties to this Agreement that if a party obtains a judgment against the other for breach of any provisions hereof, the complaining party's contract damages shall include all attorney's fees and other litigation expenses incurred by the complaining party in obtaining such judgment.

32.    **GENERAL PROVISIONS.**

a.    This Agreement as of the Effective Date hereof cancels and supersedes all prior and contemporaneous representations, inducements, agreements, commitments, and undertakings with respect to the subject matter of this Agreement, except those written agreements relating to any indemnification, reimbursement, indebtedness, or debt security obligations (including, but not limited to, any security interest, security agreement, guaranty, mortgage, deed of trust, promissory note, or UCC filing).

b.    Except as expressly provided under this Agreement, this Agreement may be amended or supplemented only in writing signed by both parties.

c.    Any waiver of any provision of this Agreement must be in writing signed by the parties. Either party's delay or failure to enforce any provision of this Agreement or any course of dealing or trade custom or usage will not operate as a waiver of compliance with that provision or a waiver or estoppel of the party's right to enforce any other provision of this Agreement.

d.    The provisions of this Agreement are severable. If any provision of this Agreement is, for any reason, invalid or unenforceable, the remaining provisions of this Agreement are valid and enforceable if the basic intent of the parties is still capable of being achieved.

e.    This Agreement is binding upon and enforceable against he parties' respective successors, permitted assignees, legal representatives, executors, administrators, heirs, and legatees.

f.    Neither this Agreement nor any subsequent agreement amending or supplementing this Agreement is binding unless a duly authorized representative of Seller signs the Agreement, amending, or supplement.

33. **TITLES.** Titles to paragraphs and articles of this Agreement are inserted for the sake of convenience only and not as a source of meaning. The rights and obligations of this Agreement are as delineated in the text or body of this Agreement.

34. **ADEQUATE SUPERVISION.** Retailer shall adequately supervise its employees, contractors and other persons under its control, so that they all will comply with the provisions and meet the obligations of Retailer under this Agreement so far as such persons may be responsible for such compliance and for such obligation.

35. **TERMINATION.**
   a. This Agreement shall terminate upon expiration of the term stated in Article 4.
   b. This Agreement may be terminated by Seller: (i) if Retailer makes any material false or misleading statement or representation which induces Seller to enter into this Agreement, or which is relevant to the relationship between the parties hereto; (ii) if Retailer becomes insolvent or commits an act of bankruptcy or takes advantage of any law for the benefit of debtors or Retailer's creditors, or if a receiver is appointed for Retailer; (iii) if possession of the Retailer's Station is interrupted by act of any government or agency thereof; (iv) if Retailer fails to pay in a timely manner any sums when due hereunder; (v) if Retailer defaults in any of its obligations under this Agreement; (vi) if Retailer is declared incompetent to manage his property or affairs by any court, or if Retailer is mentally or physically disabled for three (3) months or more to the extent that Retailer is unable to provide for the continued proper operation of the business of the Retailer; (vii) under the circumstances described in causes for termination by Seller elsewhere in this Agreement; (viii) if Retailer dies; (ix) if Retailer engages in fraud or criminal misconduct relevant to the operation of the business of the Retailer; (x) if Retailer is convicted of a felony or of a misdemeanor involving fraud, moral turpitude or commercial dishonesty, whether or not the crime arose from the operation of the business of the Retailer; (xi) if Retailer fails to purchase the minimum monthly, quarterly, or annual gallonage requirements outlined in this Agreement or if Retailer fails to maintain an inventory of any one or more grades of motor fuel covered by this Agreement in an amount adequate to meet customer demand; (xii) if there occurs any other circumstance under which termination of a franchise is permitted under the provisions of the Petroleum Marketing Practices Act (P.L. 95-297); or (xiii) upon assignment of the Agreement by Retailer contrary to the terms and conditions contained in this Agreement.
   c. Any termination of this Agreement shall be accompanied by such notice from Seller as may be required by law.
   d. Upon the expiration of the term hereof or upon termination hereof, Seller shall have the right, at its option, to enter upon the Retail Station and to remove, paint out, or obliterate any signs, symbols or colors on said Retail Station or on the buildings or equipment thereof which in Seller's opinion would lead a patron to believe that Seller's products are being offered for sale at the Retail Station.
   e. Upon loss of Seller's right to grant the Supplier's Identifications, Seller may terminate this Agreement. Seller will not be liable for the consequences of such loss unless they result from an act by Seller taken in bad faith for the purpose of causing the loss of Seller's right to grant the right to use the trademark.
   f. Termination of this Agreement by either party for any reason shall not relieve the parties of any obligation theretofore accrued under this Agreement.

36. **MARYLAND DEALER DISCLOSURES.** Where Retailer is the owner/operator of the Retailer's Station in the State of Maryland, Retailer acknowledges and states that the applicable disclosures pursuant to *Maryland Code, Commercial Law*, §11-303 set forth more fully in Exhibit

"D" attached hereto and incorporated herein were made by Seller prior to the execution of this Agreement.

Executed on the date shown below

**Khalid Jamil**

[Retailer]

By: _____

     Khalid Jamil

Title:    OMQN .

Date:   4/28/03

**SMO, Inc.**

[Seller]

By: _____

     John R. Binette

Title: Pre̶sident _____

Date: _____ 5/2/03 _____

## EXHIBIT A

### Authorized Facilities and Uses

The following uses/facilities designated by an "X" are authorized by Seller at the Retailer's Station:

| ✓ | Use/Facility | Description (Optional) |
|---|---|---|
| | Alternative Motor Fuel (CNG, M-85, etc.) | |
| ✓ | ATM | |
| | Bill Boards | |
| | Car Detailing | |
| | Car Wash | |
| ✓ | Check Cashing | |
| | Clothing (e.g., T-shirts, etc.) | |
| | Dry Cleaning | |
| | Florist | |
| ✓ | Food Mart/Convenience Store/Snack Shop | |
| | Insurance | |
| ✓ | Lottery Sales | |
| | Mail Box/Shipping | |
| | Money Wiring | |
| ✓ | Parking | |
| ✓ | Pay Phone, Telephone Booth or Transmitter | |
| | Photo Services (Booth, Drop Off, etc.) | |
| ✓ | Propane | |
| | Quick Lube | |
| | QSR (Quick Service Restaurant) | |
| | Satellite | |
| | Ticket Agency/Mapping Services (e.g., through a Kiosk) | |
| ✓ | Vehicle/Trailer/Boat/Motorcycle/Other Equipment Sales and/or Rentals | |
| ✓ | Vehicle Repair | |
| ✓ | Vending Machines: | |
| | Video or Game Equipment | |
| | Video Rentals | |
| | Other: | |

*The above list is merely intended to be illustrative of the many uses/facilities potentially available to the Retailer as authorized by Seller but is not intended as a complete and definitive list.

Initials of both parties: _RM_  _____

4-28-3

Purchase and Sale Agreement - 484-2003                    22

**EXHIBIT B**
**SCHEDULE OF SELLER'S EQUIPMENT**

The following items are property of the Seller and are subject to the rights and limitations set forth in the Agreement to which this Exhibit B is attached:

Title to such items shall at all times remain with Seller. This Schedule is not to be deemed exclusive per se and may be amended by mutual acknowledgement of the parties.

# EXHIBIT C

## Environmental Regulation Supplement

In the operation of Retailer's Station, Retailer shall strictly comply with the regulations of the Environmental Protection Agency ("EPA") promulgated as Part 80—REGULATION OF FUELS AND FUEL ADDITIVES, of Chapter I, Title 40, Code of Federal Regulations ("C.F.R."), and with any applicable state regulations covering gasoline and diesel fuel, as amended from time to time (the "Regulations"). "Gasoline," "Diesel Fuel," and other terms used in this Exhibit C have the same meanings as defined in the Regulations. With respect to Retailer's Station, Seller and Retailer agree as follows:

a.    Seller's Responsibilities, Seller may:

    (1)    Continuing for the period, as Seller deems appropriate, in Seller's sole judgment, take periodic samples from Retailer's Product dispenser(s) or from other retailers supplied from the same Plant and test such samples to determine whether the Products are in compliance with the Regulations. Any such sampling and testing will not relieve Retailer of any obligation Retailer has under the Agreement or by Law to sell, dispense and offer for sale only Products complying with the Regulations.

    (2)    Give prompt notice and details to Retailer (by telephone, followed by formal notice) if any test performed under (1) above, or through other circumstances known to Seller, indicates that Retailer's gasoline or diesel fuel inventory is not in compliance with the Regulations. Seller shall cooperate with Retailer in any further action taken that is necessary (including pump out) to restore the availability of complying Products. The costs of any such further action, including further sampling and testing, will be at Retailer's expense if the cause of contamination was within Retailer's control.

    (3)    Arrange for painting the manhole covers and fill line caps to identify storage tanks dedicated to unleaded gasoline.

b.    Retailer's Responsibilities.

    (1)    Retailer shall use only facilities and equipment to store and dispense gasoline and diesel fuel, which have been approved for such by Seller.

    (2)    Retailer shall not mix or allow to be mixed unleaded Seller-branded gasoline with any gasoline containing lead anti-knock agents. Retailer shall not sell as unleaded Seller-branded gasoline any unleaded Seller-branded gasoline, which is mixed with lead anti-knock agents.

    (3)    Retailer warrants that no leaded gasoline (.e., gasoline containing unlawful amounts of lead or phosphorus) will be introduced into any motor vehicle which is labeled "UNLEADED GASOLINE ONLY" for which is equipped with a gasoline tank filler inlet which is designed for the introduction of unleaded gasoline only.

    (4)    Retailer shall not sell, offer for sale, dispense, supply, offer for supply transport, or cause the transportation of gasoline in which the Reid Vapor Pressure exceeds the legally applicable standard or where the oxygen content is below the legally applicable standard. Retailer shall not sell, offer for sale, dispense, supply, offer for supply, or transport reformulated gasoline which is below the legally applicable

standard under the Law for the geographical area and time period in which such gasoline is intended to be dispensed to motor vehicles.

(5)     Retailer shall not sell, offer for sale, supply, dispense, offer for supply, transport, or cause the transportation of any diesel fuel for use in motor vehicles unless the diesel fuel (i) has a sulfur percentage, by weight, no greater than 0.05 percent, (ii) has a cetane index of at least 40, or a maximum aromatic content of 35 volume percent, (iii) is free of visible evidence of the dye 1,4-dialkylamino-anthraquinone and (iv) is free of visible evidence of the dye solvent red 164 unless it is used in a manner that is tax exempt as defined under section 4082 of the Internal Revenue Code.

(6)     Retailer shall not sell, offer for sale, supply, and offer for supply, transport, or cause the transportation of gasoline unless such gasoline is additized in accordance with the requirements of 40 C.F.R. §80.161, as may be amended from time to time.

(7)     Retailer shall maintain all hanging hardware for fuel pumps or dispensers in good operating condition and repair and otherwise in compliance with the Regulations. Hanging hardware includes, but is not limited to, whip hoses, breakaways, flow restrictors in the hose assembly, hoses, nozzles, nozzle spouts, swivels, splash guards, clamps, or colored scuff guards, including any associated with a vapor recovery system.

(8)     Retailer shall establish and enforce an oversight compliance program to assure the Retailer, Retailer's employees or agents, or third parties (including the employees, agents or contractors of Seller) will not cause, allow, or permit Retailer's Products to not be in compliance with the Regulations or become contaminated with any other gasoline or diesel fuel product or foreign substance, at any time after delivery by or for Seller to Retailer. The oversight program must include periodic sampling and testing by Retailer of Retailer's Products inventory; securing the manhole covers, fill line caps and dispensers to avoid unauthorized entry or use; and supervising and instructing Retailer's employees and other shaving access to Retailer's Products system regarding proper procedures to prevent Retailer's gasoline and diesel fuel from becoming noncompliant with the Regulations and to prevent contamination of Retailer's Products.

(9)     Retailer shall give prompt notice and details to Seller (by telephone to Seller's Region Office) of (i) the EPA"s or state agency's taking a sample of any Products to test for compliance with the Regulations and (ii) receipt of any test results from any such sampling.

(10)    In the event of a real or suspected spill, leak, release, or discharge of petroleum or hazardous products requiring a report thereof under federal, state, or municipal law, ordinance or regulation, including without limitation the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, *et seq.*, the Clean Water Act, as amended, 33 U.S.C. § 1251, *et seq.*, and 40 C.F.R. Part 280, Retailer shall render the required report in accordance with such applicable law as soon as practicable but in any case within twenty-four (24) hours of such event. Within twenty-four (24) hours of the event requiring such report, Retailer shall notify Seller by telephone of the circumstances or occurrence that required such report to be submitted and shall follow-up with a prompt, written, formal notice to Seller thereof. In addition to the foregoing, Retailer shall give prompt notice and details to Seller (by telephone to Seller's office, followed by formal notice) of any other circumstance or occurrence at Retailer's Station which reasonably could cause Retailer's Products, or dispensing equipment to not be in compliance with the Regulations. Upon discovery of any of the foregoing spill, leak, release, discharge or other circumstance or occurrence, such

condition Retailer shall cease selling, dispensing, or offering for sale such Products until Seller and Retailer can mutually determine by sampling, testing, or other means whether the Product is in compliance and, if found to be not in compliance, take such further action as is necessary (including pump out) to restore the availability of a complying product. The sampling, testing, or further action will be at Retailer's expense if the cause of contamination was within Retailer's control.

(11)     Retailer shall obtain, properly affix, and maintain all Products required by Law to be affixed to Retailer's station, including gasoline and diesel fuel pump island and dispenser labels.

(12)     If Retailer fails to comply with the Laws relating to UST systems or those set forth in this Exhibit C, based upon evidence satisfactory to Seller, Seller may, in addition to other rights or remedies available to Seller, suspend deliveries of the affected Products to Retailer and enter Retailer's Station to take such appropriate action, Seller's sole judgment (including padlocking the pump dispensers), to avoid any violation of this Agreement or the Regulations.

(13)     Retailer certifies that Retailer has read, understands, and is fully informed of the relevant Regulations pertaining to gasoline and diesel fuel, and Retailer shall fully comply with the provisions thereof whether or not such obligations are referred to or restated in this Agreement.

## EXHIBIT D

### Disclosures Required Under

### Maryland Code, Commercial Law, §11-301

With respect to Maryland Retailers only, the following disclosures are made, as applicable, under Maryland Code, Commercial Law, §11-303:

1.    Any gallonage history of the Retailer's Station for the shorter of

   (a)    The three (3) year period immediately past; or

   (b)    The entire period during which the location has been supplied by Seller;

2.    The name, last known address, and reason for the termination of the marketing agreement of each person who was a dealer at the Retailer's Station during:

   (a)    The five (5) year period immediately past; or

   (b)    The entire period during which the Retailer's Station has been supplied by Seller;

3.    Any commitment for the sale, demolition, or other disposition of the Retailer's Station;

4.    Any training program and any specific goods and services that the Seller will provide for and to Retailer;

5.    Any obligation that will be required of the Retailer;

6.    Any restriction on the sale, transfer, and termination of the Agreement; and

7.    The total amount of any cash deposit required, any amount of interest to be paid on the deposit, and the conditions for the return of the deposit.