# EXHIBIT "B"

LEASE

DATA SHEET

LOCATION NO.   484

DATE:                         April 23, 2003

LESSOR:                       SMO, Inc.

Address:                      6355 Crain Hwy.

City and State:               LaPlata, MD                              , Zip Code    20646

LESSEE:                       Khalid Jamil

Residence Address:            804 South College Avenue

City and State:               Newark, DE                        Zip Code   19713

Business Address:             (If different from above)

City and State:                                                    , Zip Code

LEASED PROPERTY:              Shell

Street Address:               804 South College Avenue

City:                         Newark

County and State:             New Castle, DE                Zip Code      19713

      The provisions of this Lease are set forth in the "Recital," "Terms and Conditions" (Sections 1 through 40) and Exhibit A, attached hereto and made a part hereof.

## RETAIL FACILITY LEASE

THIS RETAIL FACILITY LEASE is effective **May 1ˢᵗ, 2003** ("Effective Date") between SMO, Inc. ("Lessor"), whose address is 6355 Crain Highway, P.O. Box 2810, LaPlata, MD 20646, and **Khalid Jamil** ("Lessee") whose address is **804 South College Avenue, Newark, DE 19713**.

This Lease is comprised of two parts. PART I sets forth the variable provisions of this Lease and references the applicable articles in PART II that sets forth the general provisions. To the extent there is a conflict between PART I and PART II, the provisions in PART I are controlling.

### PART I

**Article No.**

DEF (e)     Leased Premises are located at: **804 South College Avenue, Newark, DE  19713**

2     This Lease begins on the Effective Date specified above and expires 36 months after the 1ˢᵗ day of the first full month following the Effective Date ("Expiration Date").

3     Rent: Lessee shall pay Lessor the following monthly base rentals, plus an amount adjusted at the end of each 12-month period basis as described in this article:

| | |
|---|---|
| Months 1 — 12: | **$6,627.00** |
| Months 13 — 24: | **$6,627.00** |
| Months 25 — 36: | **$6,627.00** |

The above rent amounts include double net expenses and real estate taxes.

21     Notice — Underlying Lease: This Lease is subordinate to an underlying lease that may expire on **n/a** before the expiration of this Lease. [or: on the date of the expiration of this Lease]. This underlying lease may or may not be extended or renewed on the date it expires. Lessor is under no obligation to extend or renew such underlying lease or make best efforts to extend or renew it. If the underlying lease does expire on **n/a** then this Lease will also expire at the same time [or: this Lease will not be renewed].

FACILITY SHALL BE OPEN 24 hrs, 7 days a week, except where Lessor and Lessee otherwise mutually agree to modify the hours of operation. The following hours are mutually agreed to:

Lease 484-2003

## Hours of Operation

For the months of ____ **May to April**

|           | FROM  |       | TO    |       |
|-----------|-------|-------|-------|-------|
| Sunday    | 12:00 | a.m.  | 11:59 | p.m.  |
| Monday    | 12:00 | a.m.  | 11:59 | p.m.  |
| Tuesday   | 12:00 | a.m.  | 11:59 | p.m.  |
| Wednesday | 12:00 | a.m.  | 11:59 | p.m.  |
| Thursday  | 12:00 | a.m.  | 11:59 | p.m.  |
| Friday    | 12:00 | a.m.  | 11:59 | p.m.  |
| Saturday  | 12:00 | a.m.  | 11:59 | p.m.  |

Key Management Person designated for Lessee if Lessee is a Business Entity or Joint Lessee:

_JAMIL R. KHAN._

NOTE TO LESSEE:  BE SURE TO READ AND UNDERSTAND ALL OF THE PROVISIONS OF PART I AND PART II OF THIS LEASE BEFORE YOU SIGN BELOW:

Executed on the date shown below.

**LESSEE (personally & individually):**

**Khalid Jamil**

By: _____
   Khalid Jamil

Title ___ OMer. ___

Date: ___ 4/28/03 ___

**LESSOR:**

SMO, Inc.

By: _____
   John R. Binette

Title:  President

Date: ___ 5/12/03 ___

Lease 484-2003

3

DEFINITIONS. As used in this Lease, the terms below have the following meanings, whether singular or plural:

(a) "Agreement" — The Purchase and Sale Agreement between the parties hereto entered into contemporaneously with this Lease.

(b) "Alteration" — Any addition, modification, removal, or replacement (except as expressly provided in this Lease) of any building, improvement, or equipment on the Premises.

(c) "Business Entity" — Any legal entity that is not an individual or sole proprietorship, including, without limitation, a partnership, corporation, limited liability company, limited liability partnership, or association,

(d) "Law" — Any applicable statute, constitution, ordinance, regulation, rule, administrative order or other requirement of any federal, state, or local government agency or authority in effect at the time of execution or during the term of this Lease.

(e) "Lease" __ This Retail Facility Lease between Lessor and Lessee.

(f) "PMPA" — The Petroleum Marketing Practices Act as may be amended from time to time (15 U.S.C. §2801 et seq.).

(g) "Premises" — The land owned or leased by Lessor at the location identified in PART I together with the buildings, improvements, and equipment existing as of the Effective Date of this Lease and located thereon after the Effective Date with Lessor's prior written consent, subject to Lessor's rights under Article 11.

1. **RECITAL.** Lessor leases to **Khalid Jamil** hereinafter referred to as Lessee, subject to the following Terms and Conditions.

2. **TERM.** The term of this Lease is identified in PART I, except that if, for any lawful reason, the accompanying Agreement is terminated or not renewed, then this Lease shall also terminate or not be renewed at the time of the termination or nonrenewal of the Agreement. Neither party has any obligation to renew this Lease, or any extensions of this Lease agreed to in writing by the parties, or continue the relationship established hereunder beyond the term provided in this except as may be required by Law.

3. **RENT.**

   (a) Lessee shall pay Lessor as monthly rent, without deduction, set off, notice, or demand the total rent set forth in PART I , ARTICLE 3 which includes double net expenses and real estate taxes. Lessor may adjust the double net expenses at the end of each 12 month period during the term of this Lease to reflect any changes in these expenses (whether increases or decreases in the amounts) based on the applicable expenses for the previous period(s). If Lessor makes such an adjustment, Lessor shall provide Lessee written notification of the same. In addition, if during the term of this Lease Lessor makes an Alteration (whether a single Alteration or several Alterations as part of a single project) to the Premises upon completion of the Alteration and notification to Lessee, Lessee's rent may be

adjusted by Lessor in a manner to reflect Lessor's additional investment in the Premises as reasonably determined by Lessor.

(b) Lessee shall pay Lessor the rent not later than the first day of each month, except that rent due on a weekend or federal holiday is payable on the business day following the due date. Rent for any period less than a calendar month will be prorated.

(c) Lessee shall pay the rent in accordance with Lessor's payment terms in effect from time to time. Lessor may require that Lessee pay the rent by electronic funds transfer initiated by Lessor or by any other method that Lessor may designate from time to time, and Lessee shall provide any written authorizations required for such purpose. Lessee shall maintain sufficient funds in Lessee's bank account to cover such payment. In addition to any other remedies available to Lessor for Lessee's failure to comply with this article: (i) Lessor may require that Lessee shall pay to Lessor a reasonable administrative fee for each instance of payment that Lessee does not have sufficient funds to cover payment and all overdue sums will bear interest at the maximum lawful rate per annum from the date due until paid, (ii) Lessor may setoff or equitably recoup against any amount then due Lessee, (iii) Lessor may defer further deliveries of the Products sold to Lessee under the Agreement until payment of all outstanding indebtedness is made, and (4) Lessor may terminate or non-renew Lessee.

## 4.    HOLDING OVER.

(a) If this Lease terminates, nonrenews or expires and has not been extended or further extended, Lessor has a right to reenter and to take immediate possession of the Premises. If Lessee retains possession of the Premises from and after the date of such expiration, then Lessor shall have the right (in addition to its other rights), to elect from the remedies available to it under law. Such remedies include, but are not limited to, treating Lessee as a periodic tenant, a tenant at sufferance, or a trespasser. Lessee will be treated as a periodic tenant only upon express written consent of Lessor and acceptance of damages as provided for in subsection (b) of this Section shall not be deemed written consent.

(b) In addition to any other rights Lessor may have at law or equity or pursuant to the Lease, for each day or fraction thereof after termination or expiration of this Lease that Lessee fails or refuses to vacate the Premises and surrender the Loaned Equipment, Lessee shall pay Lessor upon demand as minimum damages (i) a sum equal to one hundred twenty five percent (125%) of the monthly installment rental prescribed in Article 3, computed on a daily basis, or (ii) a sum equal to the maximum amount of damages recoverable by law for Lessee's holding over, whichever is greater. Either sum shall be payable in addition to any other special damages caused directly or indirectly by Lessee's holding over after the expiration, termination, or nonrenewal of this Lease. Lessor's acceptance of either sum shall in no way affect Lessor's right to immediate possession of the

Premises and shall not afford Lessee any right of possession beyond the date of termination, expiration, or cancellation of the Lease.

5.   **INDEPENDENT CONTRACTOR-LESSEE.** Lessee is an independent contractor with the right and obligation to direct and control the business operations of the Premises, including the establishment of the prices at which products and merchandise are sold. Lessor reserves no control over the business at the Premises. Lessee has no authority to employ anyone as an employee or agent of the Lessor for any purpose. Any person performing work at Lessee's request is an employee or agent of Lessee and not of the Lessor. Lessee is responsible for all premiums and contributions required by Workmen's Compensation, unemployment insurance, old age benefits and other programs measured by remuneration paid by Lessee to its employees. Lessor disclaims all liability for actions of Lessee, its employees, and others under its control.

6.   **LESSEE'S EFFORTS.** Lessee shall devote Lessee's reasonable efforts to preserve the value of the Premises for the authorized uses as specified under this Lease and the reputation of Lessor by serving effectively and efficiently the needs of the public and consumers. Lessee shall personally and actively manage the business conducted on the Premises to assure good faith compliance with the terms of this Lease.

7.   **TAXES AND OTHER BUSINESS CHARGES.**

(a)   Lessee shall pay all federal, state, and local taxes, excises, duties, and other assessments and charges, now or hereafter levied, ("Taxes") of any kind and nature assessed by any governmental authority relating to the operation, occupancy, or use of the Premises or business conducted by Lessee thereon including, without limitation, those Taxes measured by income. Without limiting the generality of the foregoing, those Taxes paid by Lessor that relate to the Premises or business conducted thereon by Lessee including, but not limited to, ad valorem, sales and use, and personal property taxes on Lessor's property and equipment or any leased property and equipment located on the Premises will be passed on to Lessee as a double net expense.

(b)   Unless Lessor elects to do so at Lessee's expense, Lessee shall obtain and maintain, at Lessee's expense and in Lessee's name unless directed by Lessor otherwise, all licenses, registrations, and permits necessary for the operation of Lessee's business on the Premises, including, but not limited to licenses or fees to operate the UST system on the Premises.

(c)   Lessee shall timely pay all utility expenses, including, but not limited to, those relating to water, sewer, gas, telephone, electricity, and power to operate the Premises. Lessee shall transfer, or request the transfer of, all meters and accounts to Lessee's name unless Lessor directs otherwise. Lessee shall pay all other operating expenses relating to the operation of the business on the Premises, including, but not limited to, those relating to waste disposal, pest control, landscape, and snow removal.

Lease 484-2003

6

(d)    If Lessee fails to perform any of its obligations under this Article, Lessor may, at its sole option satisfy such obligations that Lessee has failed to perform, and Lessee shall reimburse Lessor upon demand for the costs incurred by Lessor in doing so without prejudice to any other rights or remedies available to Lessor under this Lease or Law.

8.    **MAINTENANCE.** As of the Effective Date of this Lease, Lessee acknowledges that the Premises are in good condition and repair. At Lessee's own expense, Lessee shall timely perform the maintenance obligations set forth in Exhibit A, as may be amended by Lessor from time to time upon written notice to Lessee. Lessee shall keep Lessee's own property in good condition and repair. Lessor shall perform all other maintenance to the Premises. Lessee shall pay Lessor an amount for maintenance, which will be passed on to Lessee as a double net expense included in rent amount in PART I, ARTICLE 3. Notwithstanding Lessor's maintenance obligations, Lessee has the primary obligation to keep the premises safe for all persons. Accordingly, Lessee shall immediately notify Lessor if any portion of the Premises is in need of maintenance by Lessor and shall perform any necessary interim maintenance to keep the Premises in a safe condition until such time as Lessor is able to do so within a reasonable time after receipt of notice from Lessee. If Lessee fails to perform its maintenance obligations, Lessor may perform those maintenance obligations and will charge to Lessee the Lessor's actual cost in performing the same in addition to the rent collected in PART I, ARTICLE 3. If Lessee fails to provide Lessor with any required notice relating to the maintenance of the Premises, Lessee shall be solely responsible for any resulting injury or damage.

9.    **SERVICES AT PREMISES.** Lessee shall:
   a)    operate the Premises responsibly, with due care, prudence, good judgment and skill;
   b)    provide services comparable with competitive serve stations of similar type, age and style;
   c)    treat courteously all persons entering the Premises for any legitimate purpose;
   d)    not engage in dishonest, fraudulent, or scare selling practices;
   e)    promote diligently the sale of motor fuels;
   f)    make no unlawful or offensive use of Premises;
   g)    perform all services in a good, workmanlike manner;
   h)    maintain the restrooms in a clean, sanitary, well-lighted, and usable condition, adequately provided with necessary supplies;
   i)    actively and personally participate daily in the management of Premises to ensure compliance with this lease and proper use and maintenance of Premises;.
   j)    not use Premises for the parking, storage, rental, or sale of motor vehicles, trailers, or any other vehicles or equipment;
   k)    keep the Premises open for business, fully and adequately staffed with personnel capable of conversing in English with law enforcement, fire, and government officials and other safety professionals, and properly lighted during all agreed-upon hours as set forth in Part I;

l)  forward to Lessor immediately upon receipt, by facsimile or overnight delivery service, copies of all notices from governmental or administrative authorities that may apply to or affect Lessor's interest or rights in Premises, or that result from actual or alleged violations of laws or standards at Premises;

m)  use all equipment provided under this Lease, including the Loaned Equipment, within the limitations imposed by the equipment manufacturers. In regard to tanks, lines, dispensers, pumping devices, spill containment, overfill prevention, vapor recovery, environmental- or safety-related devices, and/or all monitoring and testing equipment (collectively "Tank Systems") on Premises, Lessee shall not install any such Tank Systems on the Premises, in whole or in part, without the express prior written consent of Lessor and, if consent is given, any such installation shall be made in accordance with all terms and conditions of that consent;

n)  provide well-trained, uniformed, courteous, and neat-appearing personnel to serve the needs and desires of the motoring public;

o)  operate the Premises and Loaned Equipment in strict adherence with service and appearance standards adopted by Lessor;

p)  keep legible, visible, and fixed at their selected, commercially advantageous locations all trademarks and signs provided by Lessor;

q)  do or permit nothing to be done to Premises or any part of them which is prejudicial to Lessor's title thereto or interest therein; and

r)  maintain the Premises in accordance with the appearance standards established for a retail facility selling the brand of motor fuel which Lessee sells, which appearance standards shall either be provided to Lessee or shall be made available to Lessee upon request;

s)  Lessor agrees, at its own expense, to make all repairs (which Lessee is not required to make) to the Premises leased hereunder upon written notice from Lessee to Lessor or its designated representative; provided, however, that such repairs (i) are necessary, in Lessor's sole discretion, and (ii) have not been caused by negligence or misuse by Lessee or Lessee's employees or other persons subject to his control;

t)  If Lessee shall fail to perform maintenance or repair within fifteen (15) days following notice by Lessor to Lessee, Lessor shall have the right, but not the obligation, to perform any maintenance or repair which is the responsibility of Lessee under this Lease. Lessee shall pay to Lessor the cost of such maintenance or repair within thirty (30) days of Lessor's billing for same;

u)  If Lessor shall become obligated by federal, state or local laws, rules or regulations to install or construct additional equipment, facilities, or improvements on the Premises in order to permit continued operation of a retail service station thereon, and in Lessor's sole judgment the cost of such installation or construction would be uneconomical to Lessor, Lessor shall have the right to terminate this Lease; provided, however, in lieu of termination Lessor may at its sole discretion refrain from termination if Lessor and Lessee are able to agree to an increased rental. Lessor, however, retains the right to terminate this Lease notwithstanding any offer of rent that Lessee may make.

**10.    ALTERATIONS.**

(a)    Lessor's Alterations. (i) Except to the extent limited by applicable Law, at any time during the term of this Lease, Lessor may, at Lessor's sole discretion, make Alterations to the Premises, including without limitations to convert the Premises for use as a modern, first class convenience store operation, with associated gasoline dispensing facilities, and other offerings that Lessor deems advisable to enhance the capacity of the Premises for sales of motor fuels and convenience store items. Lessor shall be authorized to convert the Premises for the aforesaid purposes through a demolition of the existing improvements at the Premises, and a rebuilding thereof, or through an Alteration and/or reconfiguration of the existing improvements of the Premises by a reduction, enlargement or re-shaping of the land constituting the Premises and a change in the means of ingress and egress to and from the Premises. Such demolition, rebuilding, Alteration and reconfiguration shall be at Lessor's expense. Lessee acknowledges and understands that any demolition, rebuilding, Alteration, modernization, or reconfiguration of the existing improvements and/or land and other facilities at the Premises (hereinafter the "Work") for the aforesaid purposes may require a temporary closure of the gasoline dispensing facility and, if applicable, convenience store and other facilities at the Premises and/or a temporary closure and/or curtailment or adjustment of Lessee's operations thereon and that such temporary closure and/or curtailment or adjustment of Lessee's operations may result in a loss of business income and business opportunities for Lessee that will not be reimbursed by Lessor. Lessor may reduce or suspend the rent payable during the period that the Work is being performed. Upon completion of the Work, Lessee shall operate the gasoline dispensing facility and, if applicable, convenience store and other facilities at the Premises in accordance with the terms and conditions of this Lease, the Agreement, and Lessor's then existing standards and procedures for convenience store operations.

(ii) In the event that Lessor decides to proceed with the Work as outlined above during the term of this Lease, Lessor shall provide Lessee with sixty (60) days advance written notice outlining the Work to be performed at the Premises and Lessor's estimate of the date of completion thereof. Lessor shall not commence the Work until the expiration of the sixty (60) day period. Upon completion of the Work, Lessor shall provide Lessee with an itemization of all costs and expenses incurred by Lessor for the Work, including without limitation all associated legal and other fees and expenses, debt service, architectural designs and engineering work, site layout, and permits. New monthly rentals shall be paid by Lessee to Lessor commencing on the date that Premises reopens for business (hereinafter "New Rent"). The New Rent for the Premises shall be the sum of the following:(A) the Rent as provided in Part 1 of this Lease, plus (B) an amount equal to an appropriate return as determined by Lessor in good faith, at Lessor's option, on either (1)Lessor's investment in the reconfigured Premises or the (2) the enhanced value thereof, such return prorated over the remaining term of the

Lease. If Lessee is not satisfied with the New Rent, Lessee may terminate the Lease.

(iii)  Lessee shall be responsible for purchasing all its inventory for resale at any convenience store constructed at the Premises and for purchasing coolers and other equipment necessary for the operation thereof. Lessee may also be required to operate the convenience store under a trademark or trade name furnished by Lessor and to provide offerings of a kind and quality offered at other convenience stores bearing the same trademark or trade name.

(b)  Lessee's Alterations. Lessee may not make any Alteration to the Premises without Lessor's prior written consent. Any Alteration authorized by Lessor will be at Lessee's own expense, must be made in accordance with plans and specifications approved by Lessor and any agreement between the parties, and must be performed by a contractor approved by Lessor. Lessee shall, at Lessee's expense, maintain the Alteration in a good and safe condition. If Lessee fails to maintain the Alteration, Lessor may do so and charge Lessee its reasonable expenses. At Lessor's election, upon termination or nonrenewal of the franchise relationship, Transfer of the Lease or as otherwise agreed to by all parties, any Alteration made by Lessee will become a part of the Premises and the property of Lessor, without any cost to Lessor. In the alternative, upon written notice to Lessee, Lessor may require that Lessee, within 30 days after termination or nonrenewal of the franchise relationship, remove any Alteration and restore the Premises to the condition prior to making the Alteration.

## 11.  LEASED PREMISES AND USE.

(a) Lessor leases the Premises to Lessee under the terms of this Lease. Lessee shall use the Premises solely for the operation of a motor fuel dispensing station or, if approved by Lessor, an automobile service station, except where Lessor has given its prior written consent for other, additional uses If Lessor consents to Lessee's additional use, Lessor reserves the right to a portion of the fees, income or other revenue generated by such use.

(b) Notwithstanding anything to the contrary stated herein, Lessor reserves the right to make use of the Premises for other business uses so long as any such use does not materially interfere with the authorized use of the Premises then being made by Lessee. Lessor reserves the exclusive right to any fees, income, rentals or other revenue generated by such use by Lessor.

(c) This Lease is subject to all covenants and restrictions contained in any deed or lease conveying or leasing the Premises to Lessor and all other deed restrictions, zoning laws, easements or encumbrances affecting the Premises, now or after the Effective Date of this Lease. Lessor reserves the right to grant a mortgage or security interest in the fee and leasehold interests affecting the Premises. This Lease is also subject and subordinate to any mortgage affecting the Premises now or after the Effective Date of this Lease provided the mortgage contains a "non-disturbance" clause requiring that the mortgagee not disturb the possession of Lessee, its successors, and assigns as long

as they are not in default under this Lease. Upon Lessor's request, Lessee shall promptly execute and deliver to Lessor any instrument required by a mortgagee relating to Lessee's subordination of its rights under this Lease. Lessor also reserves the right to grant easements, rights-of-ways, and licenses affecting the Premises.

(d) Lessee may not use the underground storage tank ("UST") system, including the associated product lines, or motor fuel dispensing equipment provided by Lessor under this Lease to store, handle, distribute, market or sell motor fuels not bearing the brand that Lessee is permitted to use under the Agreement without the prior written consent of Lessor.

(e) Lessee shall not either place or remove any buildings or other permanent improvements at the Premises or make any alterations or changes in or to the Premises or any part of the Premises without prior written permission of Lessor;

(f) Lessee shall not store or sell intoxicating liquors, illegal or prescription drugs, or permit intoxicating liquors or illegal drugs to be used or consumed at the Premises;

(g) Lessee shall not perform body or fender repair on Premises;

(h) Lessee shall report immediately to Lessor (and anyone else to whom notice is required by law or regulation) any serious accidents including, but not limited to, fires or explosions; and

(i) Lessee shall operate the Premises in accordance with the terms of this Lease, the Agreement and applicable safety rules issued by all competent governmental authorities, in addition to those safety rules issued by the Lessor's Supplier, as the term Supplier is defined in the Agreement and by the Lessor, including, but not limited to, the following Safety Rules:

(1) Class I Safety Rules: (a) keep fully operational fire extinguishers on Premises at all times; (b) do not use or maintain or permit to be used or maintained on the Premises welding equipment of any type or any open-flame equipment; (c) do not drain or permit the drainage of gasoline inside buildings on the Premises; (d) do not store or permit gasoline to be stored inside the buildings on the Premises; (e) do not burn or permit burning of trash in the vicinity of any building or the underground storage vents on the Premises; (f) do not use or permit to be used on the Premises for cleaning purposes any flammable liquids such as gasoline, naphtha, or lacquer thinners; (g) do not permit gasoline or waste to enter the ground or any public or private water system, storm drain, or sewage disposal system; and (h) do not permit flammable materials (including but not limited to, smoking materials such as tobacco, pipes, etc.) near pumps, tanks, trucks, lube or wash bays.

(2) Class II Safety Rules: (a) do not use air pressure on anti-freeze drums; (b) do not use or permit the use of any defective electrical equipment; (c) store oil-soaked rags only in covered metal containers; (d) notify Lessor immediately of any unsafe conditions, including any cracks and holes in the pavement that affect safety.

Lease 484-2003

12. **EQUIPMENT AND REPORTING OBLIGATIONS.** In addition to compliance with all the requirements contained in Article 12 ("Product and Equipment Obligations") under the Agreement, Lessee agrees as follows:

    (a)    Lessee agrees to adopt and maintain procedures to be followed by all those persons handling the product or equipment or both to prevent accidents in the handling and use thereof.

    (b)    Lessee shall take reasonable steps to prevent sales of any contaminated product. If any product is found to be contaminated, Lessee shall not permit the sale of such contaminated product.

    (c)    Failure by Lessee to comply with the requirements of this Article shall constitute a waiver of any and all claims of Lessee. Further, Lessee agrees to reimburse Lessor for any and all expenses incurred as a result of leakage of product because of Lessee's failure to notify Lessor thereof.

13. **SECURITY.** Lessee shall be solely responsible for making all improvements to the Premises, including but not limited to the installation of equipment and fixtures, which Lessee deems necessary to secure the Premises against unlawful intrusion, vandalism, and criminal activity or to provide for the safety of Lessee's employees, customers or invitees (hereinafter "Security Improvements"). In the event Lessee desires to make Security Improvements, Lessee shall proceed to do so with the approval of Lessor, which approval shall not unreasonably be withheld. Lessor shall not be liable to any person for any claim or cause of action related to the lack of security at the Premises or the inadequacy, deficiency or malfunctioning of any security equipment at the Premises. Lessee shall protect, defend, indemnify and hold Lessor harmless from and against any suits, causes of action, judgments, costs or penalties arising out of or related in any way to the existence and/or level of security at the Premises.

14. **INSPECTION, RECORDKEEPING, REENTRY.**

    (a)    Lessor shall have the right of entry and access to the Premises to examine, inspect, and maintain the Premises or Loaned Equipment and to exchange or install tradenames at its discretion.

    (b)    Lessee shall have the duty to keep and maintain records that show its compliance with the terms and conditions of this Lease.

    (c)    Lessor shall have the right both to specify the type of records Lessee shall keep and to examine and copy these records and any relevant records of Lessee, wherever such records may be located. Lessor retains the right to inspect and copy such records for a reasonable time after the expiration, termination, or cancellation of this Lease.

Lease 484-2003

15.  **INDEMNITY.**

(a)  To the extent permitted by law, Lessee shall indemnify, hold harmless, and defend Lessor, its subsidiaries, affiliates and joint venture partners, and their respective directors, officers, employees, and agents ("Indemnified Party") against all claims, demands, causes of action, suits, damages, judgments, liens, penalties, and expenses including, without limitation, attorneys' fees and litigation costs, whether incurred for an indemnified party's primary defense or for enforcement of its indemnification rights (collectively, "Claim"), including, without limitation, any claim for harm, injury, or death to any person, or damage to property or to the environment arising out of or in connection with any of the following matters:

(1)  Lessee's performance or nonperformance under this lease;

(2)  Any action or omission of Lessee, Lessee's employees, agents, contractors, assigns, customers, invitees, licensees, or third parties; and

(3)  The operation of Lessee's business.

Lessee's obligation to indemnify and defend extends to any Claim caused by the concurrent or contributory negligence or fault of an indemnified party but not to any claim shown by final nonappealable judgment to have been caused by the Indemnified Party's sole negligence.

(b)  Within 24 hours after the occurrence of which may result in a Claim, Lessee shall report the same to Lessor by telephone and shall promptly thereafter confirm the same by written notice, including all circumstances thereof known to Lessee or Lessee's employees.

(c)  Promptly after receiving notice, at Lessee's expense, Lessee shall investigate, respond to, and defend any claim asserted against any Indemnified Party, including without limitation, any claim alleging the Indemnified Party's sole negligence. The Indemnified Party may participate in the defense and settlement of any claim or litigation with attorneys of the Indemnified Party's selection without relieving Lessee of any obligations under this article. Lessor shall reimburse Lessee for the amount of any judgment and reasonable defense costs paid by Lessee which represents the total liability found by final nonappealable judgment to have been caused by the Indemnified Party's sole negligence.

(d)  Any (i) requirement under the this Lease for the Lessee to obtain insurance coverage, or (ii) other indemnity obligation contained in this Lease or in the Agreement shall not limit or restrict in any way Lessee's obligations under this article

(e)  Lessee's obligations under this Article survive termination or nonrenewal of this Lease.

16.  **INSURANCE.**

(a)  Lessee shall maintain, at is sole cost, at all times during the term of this Lease, the following insurance coverage with providers satisfactory to Lessor with limits not less than those limits below (the "Insurance"):

    (i)  Garage Insurance with limits of $1,000,000 each occurrence and $1,000,000 general aggregate and Garagekeepers Legal Liability Insurance with a limit of $50,000 each occurrence, such policy to include endorsement GL20 10 Broadened Coverage, with Fire Legal Liability limits of $300,000 each occurrence. Lessees owning or operating up to and including 3 locations are subject to the minimum limits above. Lessees owning or operating 4 up to and including 5 locations shall amend their Garage policy aggregate to $300,000. Lessees owning or operating 6 or more locations shall amend their Garage policy aggregate to $500,000. In lieu of amending aggregate limits as described in this article, endorsement CG 2504 or its equivalent amending aggregate limits per location may be utilized when applied to the above described minimum limits. Limits in excess of $1,000,000 may be provided by Excess or Umbrella Liability coverage. This Insurance is only required for those locations engaged in automotive repairs, and should be used in lieu of Commercial General Liability insurance in Article 16(a)(2) below.

    (ii)  Liquor Liability Insurance if Lessee owns or operates the location and alcoholic beverages are sold at the location, utilizing endorsement CG 24 08 or its equivalent.

    (iii)  Marine Terminal or Wharfingers Liability Insurance if Lessee operates a marine facility. If Lessee supplies the marine facility via watercraft the watercraft exclusion must be deleted or equivalent coverage purchased.

    (iv)  Commercial General Liability Insurance unamended or Comprehensive General Liability Insurance with Broad Form CGL endorsement with limits of $1,000,000 each occurrence and $1,000,000 general aggregate, with fire Legal Liability limits of $300,000 each occurrence. Lessees owning or operating up to and including three (3) locations are subject to the minimum limit above. Lessees owning or operating four (4) up to and including five (5) locations shall amend their policy aggregate to $3,000,000. Lessees owning or operating six (6) or more locations shall amend their policy aggregate to $5,000,000. In lieu of amending aggregate limits as described in this article, endorsement CG 2504 amending aggregate limits per location may be utilized when applied to the above-described minimum limits. Limits in excess of $1,000,000 may be provided by Excess Liability or Umbrella Liability coverage.

(v)    Business Automobile Liability Insurance covering all vehicles used in the operations of the Lessee with limits of liability of: Bodily injury $1,000,000 each person, $1,000,000 each accident; Property damage $1,000,000; or a Combined Single Limit of $1,000,000 for bodily injury and property damage, such policy to be endorsed with MCS-90 when hazardous material transportation is involved.

(vi)    Workers' Compensation Insurance and Longshoremens' and Harborworkers' Compensation Insurance as required by Laws applicable to and covering employees of Lessee during the term of this Lease.

(vii)    Employers' Liability Insurance protecting Lessee against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a limit of $500,000 Each Accident, $5000,000 Disease-Policy Limit; $5000,000 Disease-Each Employee.

(b)    Lessee shall assure that the Insurance policies: (i) provide a waiver of subrogation in favor of Lessor where permissible by Law, (ii) allow for the separation of insureds, and (iii) provide for written notice of cancellation or material change. Notice of cancellation or change will not affect the Insurance until 30 days after Lessor receives written notice. Any deductible or retention of insurable risks will be for the Lessee's account.

(c)    Lessee shall assure the Insurance required in this Article and each certificate evidencing the Insurance issued to Lessee names Lessor and its members, subsidiaries, affiliates and joint venture partners, to the extent of their interest, and where applicable, Lessor's landlord and any mortgagee, as additional insureds without regard to the allocation of liability provisions contained in this Lease, to the extent of any claim, loss or liability within the scope of the required Insurance. The parties intend that, to the extent of their interest, the status of Lessor and its members, subsidiaries, affiliates and joint venture partners as additional insureds will not be limited. Lessee shall secure from its insurance companies and provide to Lessor, for all required Insurance, an additional insured endorsement with terms equivalent to ISO Form CG 20 26 11 and 85.

(d)    Within 30 days after the execution of this Lease and during the term of this Lease as necessary, Lessee shall provide Lessor with a certificate of Insurance evidencing Lessee's compliance with Lessor's Insurance requirements. Lessee's failure to provide certificates evidencing the requirements or purchase Insurance coverage in compliance with this article will not relieve Lessee of its obligations in this article.

17.    **LIMITATION OF LIABILITY.** Neither party is liable to the other party for indirect, special, incidental, consequential, or punitive damages arising under this Lease whether under tort, contract, strict liability, warranty, statute, or otherwise.

Lease 484-2003

**18.   ASSIGNMENTS, ENCUMBRANCES, AND RIGHT OF FIRST REFUSAL.**

a.   This Lease is personal to Lessee. Lessee shall have no power to assign, transfer in any way including transfer upon retirement, mortgage, pledge, bequeath, or sell this Lease, in whole or in part, directly or indirectly by operation of law or otherwise (all such possible actions hereinafter referred to as "Transfer"), without the prior written consent of Lessor, which consent will not be unreasonably withheld. Such consent shall be required notwithstanding any decision by Lessor to decline to exercise its right of first refusal as described more fully below. Lessee understands and agrees that such consent shall be subject to an evaluation of the prospective transferee as provided in paragraph 18(b) hereinbelow. Any attempts to Transfer this Lease or any right under it, in whole or in part, directly or indirectly, without the Lessor's prior written approval shall be null, void, invalid, and of no effect. A request for Lessor's approval of the Transfer shall be made in writing at least ninety (90) days prior to the date on which Lessee desires to make the Transfer. Lessor will have ninety (90) days (or any lesser period specified by Law), after receipt of Lessee's request for consent to Transfer and all information required to conduct the evaluation more fully described below to provide Lessee with written notice of its decision to grant or withhold its consent.

b.   Lessor's consent to any request to Transfer Lessee's rights and obligations under this Lease shall be subject to an evaluation of the ability of the prospective transferee to operate the a retail service station at the Premises. Such evaluation shall consist of, without being limited to, an examination by Lessor of the following factors or information concerning the prospective transferee to be provided to Lessor: (i) business experience during the preceding five (5) years of the prospective transferee; (ii) description of any pollution or contamination of any kind, regardless of fault, that occurred or was discovered at any site at which the prospective transferee was an owner, employee, or operator; (iii) a financial statement of the prospective transferee for the preceding three (3) years; (iv) a copy of the proposed assignment agreement between the Lessee and the prospective transferee; (v) the business reputation of the prospective transferee; (vi) credit worthiness and reliability of the prospective transferee; and (vii) any other relevant information concerning the prospective transferee. Lessee shall cause the prospective transferee to provide Lessor with all documents and information concerning the prospective transferee reasonably necessary to conduct such evaluation. Unless Lessee has paid such fee with respect to the Transfer of its rights under the Agreement, Lessee agrees to reimburse Lessor a fee for the costs and expenses related to the evaluation of said transferee in an amount equal to ten percent (10%) of the difference between (i) amount that Lessee receives from the prospective transferee for the Lessee's business at the Premises and (ii) the purchase price paid by Lessee for Lessee's business at the Premises, except that such fee shall be in an amount that is no less than FIVE THOUSAND and No/100 DOLLARS ($5,000.00) and no more than FORTY THOUSAND and No/100 DOLLARS ($40,000.00). Lessee also agrees and understands that upon the Transfer of its rights and obligations hereunder, Lessee will remain obligated under this Lease until written consent is given to the new retailer and the assignment agreement has been

executed in full. Lessor's consent to any Transfer is not a waiver of the terms of this Article 18 as to any subsequent Transfer.

c.    In addition to the requirement that the prospective transferee undergo an evaluation as provided hereinabove, the consent of Lessor to any assignment or transfer of Lessee's rights and obligations under this Lease may be conditioned upon the agreement of the prospective transferee to enter into a Trial Franchise Lease of one (1) year pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U. S. C. Section 2803.

d.    It is mutually agreed that the terms and conditions of this Lease shall be binding upon, and shall inure to the benefit of, the Parties hereto, their heirs, successors, and assigns, respectively.

e.    Where Lessee is not a Business Entity, Lessee may designate, in writing, a surviving spouse, adult child, stepchild, or parent of Lessee ("Designee") for Lessor to consider accepting as a new franchisee in the event of Lessee's death, provided (if permissible under applicable law) the Designee meets all the evaluation standards set forth in Article 18(b) above for prospective transferees. Lessee's designation revokes all prior designations, and will terminate upon termination, nonrenewal, or Transfer of this Lease, upon Lessee's delivery to Lessor of a written revocation or new designation, or upon Lessee's divorce from a designated spouse. If the Designee has been significantly involved in the Lessee's business at the Premises (as reasonably determined by Lessor) and meets all the standards normally required by Lessor of a franchisee, Lessor shall offer to enter into a new lease to replace the Lease and a motor fuel supply agreement constituting a franchise between the parties at the Premises with the Designee on Lessor's then-current terms and conditions; provided, however, Lessor shall not be required to extend credit to the Designee without adequate security. If the Designee meets all of the standards normally required by Lessor of a franchisee, but has not been significantly involved in Lessee's business at the Premises (as reasonably determined by Lessor), Lessor shall offer to enter into a trial franchise of one year pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §2803, which franchise shall include a lease for the Premises and a motor fuel supply agreement with the Designee; provided, however, that Lessor shall not be required to extend credit to the Designee without adequate security.

f.    Right of First Refusal. (i) If Lessee receives a bona fide offer from a third party to buy, lease, or otherwise for the conveyance or transfer all or any part of Lessee's interest in the Lease, which Lessee desires to accept, Lessee shall immediately notify Lessor in writing (the "Notice") of the terms and provisions of the offer and shall include with such Notice a copy of said offer. Lessor shall have the prior exclusive right ("Right of First Refusal") to buy, lease, or accept the conveyance or transfer of Lessee's interest in the Lease at the same price and on the same terms and conditions as contained in such offer. Lessor shall have forty-five (45) days from the receipt of the Notice to notify Lessee in writing if it elects to exercise this Right of First Refusal. In the event that Lessor fails to notify Lessee within said

forty-five (45) day period, Lessor shall be deemed to have elected not to exercise said Right of First Refusal.

(ii)  If Lessor elects to exercise said Right of First Refusal, Lessor and Lessee shall execute a written agreement for the transfer of Lessee's interest in the Lease within thirty (30) days thereafter, and the transaction shall be closed as soon as reasonably practicable after the execution of said agreement.

(iii) If Lessor fails to exercise its Right of First Refusal and for any reason Lessee does not thereafter sell, lease, or otherwise transfer or convey its interest in the Premises to the third party making such offer at the price and upon the terms and conditions set forth in the Notice, Lessor's Right of First Refusal shall continue in full force and apply with respect to any new offer from the third party or to an offer from another party to purchase the Premises.

(iv) If Lessor fails to exercise the Right of First Refusal and Lessee accepts an offer from the third party to purchase, lease or otherwise accept the transfer or conveyance of Lessee's interest in the Premises, such offer shall be accepted by Lessee upon the same terms and conditions contained in the Notice. The sale, lease, transfer or conveyance of Lessee's interest in the Premises shall be subject to the terms and conditions of the Lessor's Right of First Refusal hereunder.  Said Right of First Refusal shall continue in effect and apply to all subsequent offers to purchase the Premises thereafter received by said third party and its successors and assigns.

(v)  Lessor's Right of First Refusal shall continue in full force and effect for the term of the Lease and any renewal terms thereof.

g.    No Liens.  Except to the extent permitted under this Article, Lessee shall keep the Premises and Lessee's interest in this Lease free and clear of all liens, claims, or other encumbrances.  Lessee shall discharge any mechanic's, laborer's, or materialman's lien on account of labor, materials, or services performed or supplied to Lessee, or any security agreement, conditional bill of sale, chattel mortgage, or other agreement on account of personal property furnished or leased to Lessee.  Lessee shall reimburse Lessor for any costs and expenses, including attorneys' fees and costs, which are incurred as a result of the violation of the provisions of this Article.

**19.    TERMINATION OR NONRENEWAL.**  Subject to any limitations imposed by Law and in addition to all other rights of Lessor under this Lease, Lessor may terminate this Lease for any of the following grounds:

(a)    Lessee's breach of any material provision of this Lease.

(b)    Any ground permissible under the Petroleum Marketing Practices Act, 15 U.S.C. §2801, *et seq.*

(c)    Lessee's material breach of the Agreement.

**20.**  **RIGHTS AND DUTIES UPON TERMINATION OR NONRENEWAL.**

    (a)  Upon termination or nonrenewal of this Lease, Lessee shall peaceably surrender the Premises to Lessor. The Premises must be surrendered to Lessor in as good condition as when received, ordinary wear and tear excepted. If necessary, Lessor may re-enter and repossess the Premises without affecting any other rights or remedies available to Lessor under this Lease or otherwise.

    (b)  If Lessee fails to remove any of Lessee's property upon termination or nonrenewal of this Lease, or any Lessee Alteration Lessor requests Lessee to remove within 30 days after termination or nonrenewal of this Lease, Lessor may: (1) sell all or any part of the same for Lessee's account on such terms as Lessor may desire and apply the proceeds of the sale, after reimbursing itself for the costs thereof, to the payment of any indebtedness of Lessee and (2) purchase any or all such personal property on such reasonable terms as Lessor may desire. If Lessee fails to restore the Premises after removal of Lessee's property or Alteration, Lessor may restore the Premises and charge Lessee for the expenses involved in doing so.

    (c)  Lessor and Lessee stipulate and agree that the actual amount of damages arising out of the failure of Lessee to remove all of Lessee's property from the Premises and the restoration thereof upon the termination or nonrenewal of this Lease is difficult or impossible to determine. In addition to Lessor's rights under this Lease, Lessor will be entitled to compensation, as liquidated damages and not as a penalty, in the amount of $300.00 per day from Lessee from the date of termination or nonrenewal of this Lease until the date of final removal of Lessee's property and restoration of the Premises by Lessor or Lessee, as the case may be.

**21.**  **UNDERLYING LEASE.** If indicated in Part 1 that Lessor does not own the Premises, the following provisions apply.

    (a)  Lessee acknowledges that Lessor does not own the land or improvements covered by this Lease but leases the land from a third party under an underlying lease that will expire on the date set forth in Part 1. If Lessor's underlying lease is extended or renewed beyond the date stated in Part 1, then this Lease will continue in effect or be renewed, as the case may be, provided other grounds for termination or nonrenewal do not then exist.

    (b)  This Lease is subject to all conditions and restrictions affecting the underlying lease under which Lessor is now or hereafter entitled to possession. Lessee shall not commit or permit any act or omission that would impair or jeopardize Lessor's interest under the underlying lease.

**22.**  **CONDEMNATION.** If all or any part of the Premises is condemned for public or quasi-public use, or if Lessor agrees to execute a voluntary conveyance in lieu of condemnation, either party may terminate this Lease by giving the other prior notice. Lessor, not Lessee by virtue of this Lease, will be entitled to any condemnation award or payment in exchange for a voluntary conveyance, and Lessee assigns to Lessor all of Lessee's right to or interest in any award or settlement subject to any applicable requirements of the

PMPA. Nothing in this Lease, however, precludes Lessee from pursuing a claim Lessee may have directly against the condemning authority under applicable Law to receive compensation for business relocation expense or for loss of business opportunity or good will. If this Lease is not terminated because less than all of the Premises is condemned, the condemnation will not affect the obligation of Lessee to pay the full rental and to perform all of Lessee's obligations under this Lease.

23.  **BUSINESS ENTITY OR JOINT LESSEE.**

  (a)  If Lessee is comprised of more than one person, the obligations imposed under this Lease are joint and several as to each person and all of the terms apply to each person with the same effect as though that person were the sole Lessee.

  (b)  If Lessee is a Business Entity, all obligations under this Lease of a personal nature apply as if the Business Entity were an individual and, insofar as is legally possible and reasonably practicable, to those individuals who have or exercise management responsibility for the Business Entity, including, but not limited to, officers, directors or agents of corporations and partners of partnerships. The Business Entity must manage its affairs with respect to the personal obligations in a manner so as to give full force and effect to the same. Subject to Lessor's prior written approval, Lessee shall designate a Key Management Person as identified in Part I. Lessee may change Lessee's Key Management Person upon Lessor's prior written approval. If Lessee's Key Management Person exercises primary management responsibility for Lessee's day-to-day operations, Lessor may look to the Key Management Person in connection with the performance of the personal obligations.

24.  **ACTS ATTRIBUTABLE TO LESEE.** The acts or omissions of Lessee's employees and agents are the acts or omissions of Lessee. If Lessee is comprised of more than one person the acts or omissions of each such person are the acts or omissions of Lessee. If Lessee is a Business Entity, in addition to those persons mentioned above, the acts or omissions of the Key Management Person designated in Part I and of each partner, shareholder or member, as the case may be, will be considered the acts or omissions of Lessee.

25.  **NOTICES.**

  (a)  Except as otherwise specified in this Lease, all notices must be in writing and, where applicable, in compliance with the PMPA and other applicable Law. Subject to any requirements of Law, any notice may be given to Lessee by personal service or to either party by certified mail, regular mail, telegram, facsimile, mailgram, or overnight or local courier. Notice will be deemed given when (i) deposited in the U.S. Mail, postage or charges pre-paid and directed to the party for whom intended at the address in this Lease or such other address as directed by the party upon written notice to the other if given by certified mail or regular mail; (ii) deposited with the dispatching agency, postage or charges pre-paid and directed to the party for whom intended at the address in this Lease or

Lease 484-2003

20

such other address as directed by the party upon written notice to the other if given by telegram, mailgram or overnight or local courier; or (iii) confirmation is received by sending party if given by facsimile.

(b)     If Lessee is a Business Entity, Lessor may give notice to: (i) the Key Management Person; (ii) any officer or director of a corporation or limited liability company; (iii) any partner of a partnership or limited liability partnership; or (iv) any personal representative, agent, or employee of any other Business Entity.

(c)     Oral notice is deemed service as of the date given, provided it is confirmed in writing within a reasonable time, which time shall not be more than five (5) days after the oral notice is given.

(d)     Lessor or Lessee may change the address listed on the Data Sheet by written notice pursuant to this Section.

26.     **ALTERNATIVE DISPUTE RESOLUTION.** Except for an action brought by Lessor to enforce a termination or nonrenewal of this Lease or to collect indebtedness, if a dispute arises between the parties concerning their respective rights under this Lease, and where commercially reasonable and practicable, the parties shall seek to resolve the dispute by using an appropriate form of alternative dispute resolution prior to initiating litigation proceedings. If the parties are unable to reach resolution within 60 days following notice of a written claim, either party may initiate litigation proceedings. Except for an action brought by Lessor to collect indebtedness, neither party, however, may institute court proceedings against the other more than one year after the incident giving rise to the claim.

27.     **RELEASE.** The parties release each other, their respective members, subsidiaries, affiliates and joint venture partners, and their respective directors, officers, employees, and agents as of the effective date of this Lease and to the extent permitted by law, from all claims which each party may have against the other (whether ore not now known), arising directly or indirectly out of or in connection with any prior Lease, excepting, however, claims of Lessor against Lessee for indebtedness, reimbursement, or indemnification. Lessee understands that this release waives any limitation with regard to a general release that may exist under applicable law and that even if Lessee or Lessor should later become aware of a claim arising out of events or circumstances not now known or suspected to exist, Lessee or Lessor, as the case may be will not be able to assert such claim against the other.

28.     **ATTORNEY'S FEES.** It is hereby agreed to and understood by the parties to this Lease that if a party obtains a judgment against the other for breach of any provisions hereof, the complaining party's contract damages shall include all attorney's fees and other litigation expenses incurred by the complaining party in obtaining such judgment. In no event shall Lessor be liable for prospective profits or special, indirect or consequential damages. The provisions of this Section shall survive any termination, cancellation, or expiration of the Lease, however arising.

Lease 484-2003

29.    **GENERAL PROVISIONS.**

(a) This Lease as of the Effective Date hereof cancels and supersedes all prior and contemporaneous representations, inducements, agreements, commitments, and undertakings with respect to the subject matter of this Lease, except those written agreements relating to any indemnification, reimbursement, indebtedness, or debt security obligations (including, but not limited to, any security interest, security agreement, guaranty, mortgage, deed of trust, promissory note, or UCC filing).

(b) Except as expressly provided under this Lease, this Lease may be amended or supplemented only in writing by both parties.

(c) Any waiver of any provision of this Lease must be in writing signed by the parties. Delay or failure by either party of its right to enforce any provision of this Lease, and course of dealing, or trade custom or usage will not operate as a waiver of compliance with that provision or a waiver or estoppel of the party's right to enforce any other provision of this Lease.

(d) The provisions of this Lease are severable. If any provision of this Lease is, for any reason, invalid or unenforceable, the remaining provisions of this Lease are valid and enforceable if the basic intent of the parties is still capable of being achieved.

(e) This Lease is binding upon and enforceable against the parties' respective successors, permitted assignees, legal representatives, executors, administrators, heirs, and legatees.

(f) Neither this Lease nor any subsequent agreement amending or supplementing this Lease is binding on Lessor unless a duly authorized representative of Lessor signs the Lease, amendment, or supplement.

(g) If requested by Lessor, Lessee shall enter into an access agreement provided by Lessor that will provide access to the Premises by Lessor and Motiva Enterprises, LLC for the purpose of remediation and cleanup of the Premises, removal and installation of underground storage tanks on the Premises, and other related activities associated therewith.

30.    **COMPLIANCE WITH LAWS.** Lessee shall comply with all laws, licenses, and permits relating to the Premises or any use thereof, including, but not limited to, any special zoning or other governmental restrictions and any laws pertaining to environmental protection, safety, and health matters.

31.    **FORCE MAJEURE.**

(a)    Lessor need not meet any of its obligations under this Lease and is not liable for losses or damages including but not limited to, damage for loss of goodwill, special or consequential damages, or damages for failure to meet any of its obligations under this Lease where its failure results from any cause substantially beyond its control, in the sole discretion of the Lessor, whether or not such cause is or was reasonably within the contemplation of the parties at the time this Lease was executed or came into effect or thereafter. Where it is possible for Lessor to

Lease 484-2003

remove or ameliorate such cause, as for instance in labor disturbances which could be settled by Lessor's acceding to the demands of the labor group, Lessor is not obligated to take measures to effect such removal or amelioration of such measures will involve substantial additional expense or a departure from Lessor's normal practices. Without limitation of any other possible causes, compliance by Lessor with any law, regulation, order or request issued by any person, organization, agency, or department of any government or governmental authority with jurisdiction over Lessor, Lessor's assets or Lessor's operations and acting under color of law shall constitute a cause substantially beyond Lessor's control.

(b)     Upon cessation of any cause and effects, identified in the previous subparagraph, performance hereof, shall be resumed but such failure or delay shall not operate to extend the term of this Lease, nor obligate either Party to supply omitted performance.

(c)     Nothing herein contained shall excuse Lessee from paying Lessor, when due, any amounts payable hereunder or pursuant hereto.

(d)     In the vent any law, regulation, order or request issued by any person, organization, agency, or department of any government or governmental authority with jurisdiction over Lessor, Lessor's assets, or Lessor's operation, and acting under color of law (hereinafter referred to generally as legislation) prohibits or alters Lessor's ability to perform under this Lease or makes necessary additional costs for Lessor, the Lessor at its sole discretion may terminate this Lease or any other agreement between the Parties at the effective date of the legislation or thereafter on thirty (3) days written notice to Lessee without incurring any liability for damages including but not limited to goodwill.

(e)     If at any time a person with right, title, and interest in the Premises superior to those of Lessor shall make proper demand upon Lessor for possession, Lessor may terminate this Lease without liability to Lessee.

32.    ACCEPTANCE. Lessee has inspected the Premises, including all buildings, improvements and Loaned Equipment, and has found them to be in good condition and working order. Lessee accepts the Premises, including all buildings, improvements, and Loaned Equipment "AS IS AND WHERE IS". There are no express or implied warranties _____  4/28/03 . (Initials and Date).

33.    QUIET ENJOYMENT. Lessor covenants that Lessee, on paying said rent and performing the covenants contained herein, shall and may peaceably and quietly have, hold, and enjoy the said Premises for the term aforesaid, subject to the provisions hereof.

34.    SECURITY INTERESTS. Lessee agrees that he/she will sign whatever further papers may be necessary to allow Lessor to establish or perfect his title or interest to Lessor's real property or Loaned Equipment governed by this Lease.

35.    **TITLES.** Titles to Sections of this Lease are inserted for the sake of convenience only and not as a source of meaning. The rights and obligations of this Lease are as delineated in the text or body of the Lease.

36.    **WARRANTY.**

    (a)    Personal Lessee warrants that the entity that Personal Lessee represents (proprietorship, partnership, or corporation) is authorized to grant the rights and assume the obligations it is undertaking under this Lease.

    (b)    Personal Lessee warrants that Personal Lessee has authority to sign this Lease on behalf of the proprietorship, partnership or corporation, whichever is applicable.

    (c)    Lessee will on request allow Lessor to inspect such documents that verify these authorizations.

    (d)    Personal Lessee warrants and agrees that Personal Lessee is personally liable, bound to meet all obligations under this Lease undertaken by Lessee, and is also personally liable for any breach of one or more of such obligations. The entity, if any, that Personal Lessee represents, also remains so bound and so liable, jointly and severally with Personal Lessee.

37.    **ADDITIONAL PROVISIONS.** The Exhibits attached to this Lease are made a part hereof and rights, duties, or obligations created thereby are as if specially set forth in the body of this Lease.

38.    **SEPARATE INDEPENDENT AGREEMENT.** The Parties intend this Lease to be a separate and distinct agreement from the Agreement between them. These agreements are not intended to be integrated as one agreement. This Lease is to be governed by the laws of real property, except as may be superseded under Federal law.

39.    **LESSOR's RIGHT TO SELL OR ASSIGN PREMISES OR LEASE**
Lessor has the right at any time to sell or assign all or any part of its right, title, or interest in the Premises, the Loaned Equipment, or in this Lease.

40.    **HOURS OF OPERATION.** To the extent permissible by law, Lessee agrees to operate Premises 24/7 days/week. Lessee may seek modification to the requirement that Premises be kept open as a retail motor fuel store twenty-four (24) hours each day, seven (7) days each week if Lessee reasonably believes it is necessary to enhance security and deter crime at Premises. Lessor may agree to Lessee's request to modify the hours requirement if Tenant submits:

    (a) Written documentation of Lessee's fully implemented security plan that is reasonably expected to provide enhanced security at Premises; and

    (b) Information sufficient to show that, despite the existence of Lessee's implemented security plan, there is a clear probability of risk of harm occurring at Premises from violent criminal conduct during the hours of desired closure.

Lessee may seek modification to "Hours of Operation" between the hours of 11:00 p.m. to 5:00 A.M., providing that Lessee furnishes documentation satisfactory to Lessor to show that over a period of at least ninety (90) days those hours have been unprofitable to Lessee.

Executed on the date shown below.

**LESSEE:**                                      **LESSOR:**

**Khalid Jamil (personally & individually):**    **SMO, Inc.**

By:_____            By:_____

    Khalid Jamil                              John R. Binette

Title: ___OMER._____            Title:  President

Date: __4/28/03_____            Date: ___5/12/03_____

## EXHIBIT A

## LESSEE'S MAINTEANCE OBLIGATIONS

A.    Yard

Maintain, including replacement as necessary, all landscaping as necessary to retain a healthy and attractive appearance. Items include, but are not limited to, all live and artificial plantings (shrubs, grass, flowers, trees, etc.), decorative rock, mulch and bark.

1.    Repair or replace, as necessary, the entire yard sprinkler system, including, but not limited to, timers, backflow preventers (see Plumbing Section), heads, piping, and rain sensors. Lessee shall drain system as necessary to prevent from freezing.

2.    Regularly remove weeds, leaves, trash, debris, and litter from the Premises (including adjacent sidewalks, driveways and easements).

3.    Remove snow and ice from the Premises (including adjacent sidewalks driveways and easements).

4.    Keep concrete pads, sidewalks and parking spaces clean and free of stains caused by petroleum products such as motor oil, gas and diesel.

B.    Lighting—Interior

Repair or replace, as necessary, all lamps and bulbs, neons, transformers, ballasts, ballast wiring, starters, reflectors, lenses, grilles and sockets in the interior of all buildings.

C.    Plumbing

1.    Clear clogged toilets, sinks, building lube bay drains and on-property sewer lines. Clean oil separators and catch basins.

2.    Repair or replace, as necessary, all flush mechanisms and faucets (excluding those in public restrooms).

3.    Drain water lines to prevent freezing.

4.    Empty septic tanks, water reclaim tanks for carwash and cesspools as necessary. Empty and clean yard catch basins as necessary.

5.    Repair or replace, as necessary, all hose bibbs.

6.    Repair or replace, as necessary, all backflow preventors. Pay for and have performed periodic testing of backflow preventers as required by regulating authority.

7.    Repair or replace, as necessary, water wells and pumps. Excludes drilling of new water well.

8.    Repair or replace, as necessary, all water heaters.

Lease 484-2003

D.  Heating/Air Conditioning

1.  Repair or replace, as necessary, all components of heating and air conditioning system, including but not limited to, filters, controls, condensers, compressors, and wiring. Excludes total system replacement except for window/wall units. Provide water, steam, radiant, carwash entrance/exit mat or window/wall units.

2.  Repair or replace, as necessary, all components of swamp coolers, including total system replacement.

E.  Glasswork

Repair or replace, as necessary, all window and door glass, whenever scratched, cracked or broken from whatever cause. Includes bullet-resistant glass or plastic.

F.  Floors

Restore floors to original condition upon removal of equipment installed by or at request of Lessee, subject to normal wear and tear

G.  Painting

During the interval between periodic general repainting by Lessor, wash and paint all curbs, yard and building equipment, lifts, interior/exterior walls, doors, ceilings and shelving as necessary. Lessor shall furnish paint that meets Lessor's specifications at Lessee's expense.

H.  Tanks

1.  Check underground motor fuel storage tanks daily for water in accordance with Lessor's procedures.

2.  Empty waste oil tank as necessary using legally acceptable method of disposal.

3.  Pump out and dispose of water in waste oil or heating oil tank as required using legally acceptable method of disposal.

4.  Keep fills and access boxes clear of ice, snow, water and debris.

I.  Pumps/Dispensers

1.  Lubricate any motor fuel suction pumps in sue (where motor and pump are contained in dispenser housing). Lubricate suction pump weekly or per manufacturer's recommendations.

2.  Repair or replace, as necessary, all hanging hardware for fuel pumps or dispensers. Hanging hardware includes, but is not limited to, whip hoses, breakaways, flow restrictors in the hose assembly, hoses, nozzles, nozzle spouts, swivels, splash guards, clamps, or scuff guards, including any associated with a vapor recovery system. Lessee's Maintenance obligations under this provision require Lessee to immediately replace any hanging hardware that causes the fueling system to fail regulatory compliance testing. Check daily for visible leaks.

J.    Air Compressor

Repair or replace, as necessary, all components of air compressors for service bay, car wash bay/building or remote air stand including all add-on equipment such as filters, air dryers, separators, regulators, above ground piping, excluding total compressor replacement.

K.    C-Store/Food Mart and Related Equipment (if located on Premises)

1.    Repair or replace, as necessary, all components of cooler/freezer and refrigeration units (walk in and freestanding), excluding total system replacement. Provide preventive maintenance as required, but at least annually.

2.    Repair or replace, as necessary, all food accessories, including, but not limited to coffee makers, juice and soda dispensers, ice dispensers, microwaves, gondolas and all other C-store/food mart related equipment, including lamps, ballasts, fuses and glass therein.

3.    Keep food handling equipment and food preparation areas clean, sanitary and in compliance with applicable laws.

4.    Keep all equipment drain lines clean and clear.

L.    Car Wash (if located on Premises)

1.    Repair or replace, as necessary, all elements of car wash equipment, including any optional or add-on equipment with control and connection hardware, including, but not limited to, brushes, dryers, wheel scrubbers, undercarriage washers, foamers, conveyors, entrance keypads, consoles, cash/coin/token acceptors, and all elements of any water reclaim system. Perform preventive maintenance per manufacturers recommendations.

2.    Repair or replace, as necessary, all elements of overhead doors or curtains and their controls including, but not limited to, motors, sensors electric eyes, tracks, pneumatic actuators, pneumatic cylinders, chains, springs, and door edge sensors.

3.    Car wash heating system (refer to Heating/Air Conditioning section).

4.    Car wash air compressor (refer to Air Compressor section).

5.    Car wash water reclaim tanks (refer to Plumbing section).

M.    Fire Protection

1.    Repair or replace, as necessary, dry chemical or liquid fire suppression/fire sprinkler equipment for fueling area and building, including but not limited to, sensors, bottles, heads, fuseable links, alarm/monitoring systems, cables, backflow preventers, above ground wiring, piping, and conduit. Replace and recharge system as necessary.

2.    Furnish and maintain portable fire extinguishers.

3.    Pay for and have performed periodic testing and inspection of fire suppression/fire sprinkler systems, and hand held extinguishers as required by regulating authority.

N.    Other Equipment

1.    Repair or replace, as necessary, all Lessee-owned equipment.
2.    Repair or replace, as necessary, all elements of oil and lube equipment and used oil pumps, including, but not limited to, hoses, fittings, spouts, meters, pumps, above ground piping, and overhead reels.
3.    Repair and replace, as necessary, all elements of interior and exterior video monitoring systems including those required by regulating authorities such as self-serve dispenser monitoring. Maintenance responsibility includes, but is not limited to, cameras, monitors, recorders, switching devices, cables, wires, and above ground conduit. Pay for and have performed periodic testing and inspection as required by any regulating authority.
4.    Repair or replace, as necessary, above ground and below ground safes.
5.    Repair and replace, as necessary, pass through drawers.

O.    Miscellaneous

1.    Repair or replace, as necessary, all building locks and keys, latches for both interior and exterior doors and, in addition, door closers and hinges for interior doors.
2.    Repair or replace, as necessary, all elements of overhead doors, excluding total door replacement.
3.    Reset circuit breakers, replace electrical fuses.
4.    Keep restrooms, at all times, neat, clean, safe and orderly, free of offensive odors and well stocked with proper supplies and cleaning materials.
5.    Take all necessary pest control measures.
6.    Repair or replace, as necessary, all bay and C-store/food mart cabinets and shelving including, but not limited to, doors, hinges, knobs, levers, cup dispensers, and condiment racks.
7.    Maintain all paths of travel on the Premises free of obstruction and accessible in compliance with applicable accessibility law including, but not limited to, accessibility provision of the Americans with Disabilities Act.

All repairs and replacements performed by the Lessee must meet or exceed the specifications of the existing equipment (e.g., a 5-horsepower air compressor must be replaced with a 5-horsepower air compressor), of equal quality, as well as comply with Lessor's image standards, if applicable. If Lessee is unsure about a specific standard, Lessee should consult with Lessor.

# EXHIBIT "C"

# ADDENDUM AGREEMENT

THIS ADDENDUM AGREEMENT is made this 1<u>st</u> day of <u>May</u>, 2003by and between <u>SMO, Incorporated</u>, herein referred to as SELLER and <u>Khalid Jamil</u> (personally & individually) herein referred to as BUYER, having a place of business at 804 South College Avenue, Newark and New Castle County, DE 19713.

WITHNESSETH:

WHEREAS:    SELLER is the property owner of all land and improvements known as <u>804 South College Avenue, Newark and New Castle County, DE 19713</u> herein referred to as PREMISES.

WHEREAS:    Both parties are desirous of making certain changes/improvements to said PREMISES.

NOW, THEREFORE, IN CONSIDERATION OF THE PROMISES and undertakings herein set forth, the PARTIES do mutually covenant and agree as follows:

1. Both PARTIES have on this date have entered into a PURCHASE AND SALE and LEASE AGREEMENT defining the benefits, responsibilities and burdens of each PARTY.
2. SELLER agrees to adjust the monthly rent at the PREMISES to $1,656 a month for months 1-3, $3,314 a month for months 4-6, and $4,968 a month for months 7-9. After months 1-9, the rent will default back to the terms originally stated in the LEASE AGREEMENT dated May 1<u>st</u>, 2003.
3. BUYER agrees to pay $30,000 upon entering into the LEASE AGREEMENT for the above PREMISES. Payment terms are as follows:
   * $15,000 payable by BUYER at time of contract execution.
   * Remaining balance of $15,000 to be paid by BUYER paying an additional $500 extra for each delivery until balance is paid in full.

IN WITNESS WHEREOF, the PARTIES have caused this ADDENDEM AGREEMENT to be executed this date written below.

SELLER:                                          BUYER(S):

SMO, INC.                                        Khalid Jamil

John R. Bizette, President                       Khalid Jamil

WITNESS                                          WITNESS

DATE    5/1/03                                   DATE    4/28/03

Addendum Agreement - 484 (2003)

# EXHIBIT "D"

July 19, 2004

## *CERTIFIED MAIL – RETURN RECEIPT REQUESTED*

Mr. Khalid Jamil
d.b.a. 896 Shell - #484
804 South College Avenue
Newark, DE 19713

### *RE: IMAGE VIOLATION NOTIFICATION*

Dear Mr. Jamil,

This letter serves as written notification that you are in violation of your Purchase and Sale Agreement with SMO, Inc. for "Failure to maintain image and appearance standards per the Brand guidelines", Section 7(b), page 6.

I visited the site on February 16th, March 19th, April 22nd, May 20th, June 29th and July 7th, 2004. At each of these visits we discussed the overgrown weeds in the front and sides of the building and under the price sign. In addition, we discussed the excessive cars stored on the premises. At each meeting you assured me that these issues would be resolved. As of July 7th, 2004, there has been nothing done to remedy these situations.

Please be advised that the image violations mentioned above must be corrected immediately. If you fail to correct the violations, further action may be taken including termination or nonrenewal of your contracts with SMO.

If you have any questions regarding this correspondence, please call me at your convenience.

Sincerely,

Richard Miller
SMO Wholesale Representative

Cc: Location file - 484
    John R. Binette

# EXHIBIT "E"



August 19, 2005

## CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Mr. Khalid Jamil
d.b.a. 896 Shell - #484
804 South College Avenue
Newark, DE 19713

## RE: IMAGE VIOLATION NOTIFICATION

Dear Mr. Jamil,

This letter serves as written notification that you are in violation of your Purchase and Sale Agreement with SMO, Inc. for "Failure to maintain image and appearance standards per the Brand guidelines", Section 7(b), page 6.

I visited the site on August 4th and August 11th, 2005. You are still not addressing the problem with weeds at your location. In addition the lot that is next to your building remains overgrown. I have received calls from the City of Newark that this lot is in constant disarray. There still remains the problem of excessive cars stored on the premises. One additional item is the small pine trees in the front of the property. These trees are obviously dead and need to be replaced or removed. You have assured me that these issues would be addressed, they have not and they remain a constant problem.

Please be advised that due to the image violations mentioned above I see no other alternative except to terminate your contract. Please be advised that your contract will terminate on December 1st, 2005.

If you have any questions regarding this correspondence, please call me at your convenience. 302-379-0269.

Sincerely,

Richard Miller
SMO Wholesale Representative

Cc: Location file - #484
    John R. Binette

6355 CRAIN HIGHWAY, LA PLATA, MARYLAND 20646 • 301/932-3600 • FAX 301/932-3668

# EXHIBIT "F"



August 19, 2005

<u>*CERTIFIED MAIL – RETURN RECEIPT REQUESTED*</u>

Mr. Khalid Jamil
d.b.a. 896 Shell - #484
804 South College Avenue
Newark, DE 19713

### RE: HOURS OF OPERATION

Dear Mr. Jamil,

This letter serves as written notification that you are in violation of your Lease Agreement with SMO, Inc. for "Failure to maintain hours of operation your lease, page 3, hours of operation.

Per the contract it states that you are to have the facility opened for 24 hrs. Although as a bay facility you and I have verbally agreed on the hours of 6:00 am to 10:00 pm. I visited the site on August 11th, 2005. I arrived at the site at 5:45 am. I waited until 7:10 am and finally your employee showed up and opened the location for business. This is a direct violation of the lease and it will not be tolerated.

Please be advised that due to the lease violations mentioned above I see no other alternative except to terminate your contract. Please be advised that your contract will terminate on December 1st, 2005.

If you have any questions regarding this correspondence, please call me at your convenience. 302-379-0269.

Sincerely,

Richard Miller
SMO Wholesale Representative

Cc: Location file - #484
John R. Binette

*6355 CRAIN HIGHWAY, LA PLATA, MARYLAND 20646 • 301/932-3600 • FAX 301/932-3668*

# EXHIBIT "G"

November 1, 2005

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Loc 484
Kahns Shell
Attn: Kahlid Kahn
804 South College Ave
Newark, De 19713

### RE: UNIFORM NON-COMPLIANCE NOTIFICATION

Dear Kahlid,

This letter serves as written notification that you are in violation of your Purchase and Sale Agreement with SMO, Inc. for "Failure to maintain image and appearance standards per the Brand guidelines", Section 7(f), page 6. This section states that the "Retailer and Retailer's employees shall wear neat, clean uniforms of a type and style approved by Seller."

Shell performed a CVP inspection at your location on October 28th at 11:50 am. Your employees at this time were not wearing a name tag, a shell approved shirt or approved pants. I have verbally discussed this situation with you on many occasions. Please take the proper steps to have your employees comply with this contractual obligation. The approved uniform can be ordered through Lion Apparel at 1-800-543-9698.

Please be advised that you must become compliant with the Uniform policy outlined above by November 8th, 2005. Failure to do so can result in further action by SMO.

If you have any questions regarding this correspondence, please call me at your convenience.

Sincerely,

Richard Miller
SMO Wholesale Representative

Cc: Location file - 416
    John R. Binette

# EXHIBIT "H"



**MUTUAL TERMINATION AGREEMENT AND GENERAL RELEASE AGREEMENT**

Location # 484

In consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, SMO, Inc. and **Khalid Jamil** (herein called "Dealer") agree as follow:

1) To terminate and nonrenew, effective the start of business on **December 1, 2005**, the franchise relationship (as those terms are used and defined in the PMPA, 15 U.S.C., 2801 et seq) existing between them and all instruments between them, including but not limited to:

   (a) Dealer Lease
   (b) Purchase and Sales Agreement
   (c) Franchise Agreements
   (d) Retail Store Automation Equipment

   Relating to retail motor fuel location number **484** located at **804 S. College Ave, Newark DE 19713**.

1) To release each other, as of the effective date of this Agreement, from any and all claims or causes of action which each now has against the other (whether or not known to either), including, but not limited to those arising directly or indirectly under, out of or in connection with each terminated instrument, or any sales or deliveries of petroleum products including all ancillary products by SMO, Inc to DEALER, EXCEPTING, HOWEVER, claims of each party against the other for the trade accounts, rental payments, reimbursements, indemnification, and obligations arising under promissory notes or security agreements, and FURTHER ACCEPTING any claims of SMO, INC relating to real or personal property now or heretofore in DEALER's possession. In addition, DEALER will be responsible for any credit card chargebacks or returned checks for six (6) months after termination of this agreement. Further, all accounts, sales reports, deposits, and other outstanding debts must be paid in full to SMO, Inc. prior to termination.

2) DEALER acknowledges that SMO, Inc has made no representations, oral or otherwise, with respect to DEALER's ability to secure another source of supply of motor fuel after the effective date of this agreement or the terms of any such supply arrangement.

3) DEALER shall be responsible for, and shall indemnify and hold SMO, Inc harmless from and against any and all claims, demands, liabilities, or causes of action whatsoever related to any Bulk Sales Act or any claim arising thereunder.

4) SMO, Inc hereby confirms to and notifies DEALER of the termination and nonrenewal of the franchise and/or franchise relationships in effect between them, effective on the effective date of this Mutual Termination and General Release, based on this mutual agreement.

5) This writing contains the entire agreement and understanding between DEALER and SMO, Inc pertaining to this Mutual Termination and General Release Agreement and there are no oral representations, stipulations, warranties or understandings relating thereto which are not fully set forth herein. No effect unless in writing and signed by DEALER and on authorized representative of SMO, Inc.

6) This writing in no way modifies, affects, or conditions any Notice of Nonrenewal or Termination which SMO, Inc has previously given DEALER or which it may give to DEALER in regard to the referenced agreements and relationship.

7) DEALER hereby warrants that he has carefully read this instrument, understands all of its terms, and has voluntarily executed this instrument with full knowledge of its significance.

8) This agreement is executed in triplicate originals.

9) DEALER agrees to remove all personal property from the Premises prior to the effective date of this termination. DEALER further agrees that any personal property remaining at the Premises after the effective date shall become the property of SMO.

_____
Witness

Executed by DEALER on the ___1st___ day of ___November___, 20 _05_

SMO, Inc,

By: _____
**John R. Binette, President**

*6355 CRAIN HIGHWAY, LA PLATA, MARYLAND 20646 • 301/932-3600 • FAX 301/932-3668*

# EXHIBIT "I"

November 15, 2005

**HAND DELIVERED**

Khalid Jamil
d/b/a College Ave Shell
Attn: Khalid Jamil
804 South College Ave.
Newark, De 19713

> **Re:**     **Notice of Termination of Franchise Pursuant to the**
> **Petroleum Marketing Practices Act ("PMPA")**

Dear Mr. Jamil:

This letter is to formally give notice pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §2801 *et seq.* that SMO, INCORPORATED ("Franchisor") will terminate the franchise with KHALID JAMIL., D/B/A COLLEGE AVE. SHELL. (the "Franchisee") with respect to the retail service station located at 804 South College Ave, Newark, Delaware 19713 (the "Premises") ***November 15, 2005***.

The franchise is comprised of following agreements: (i) Purchase and Sale Agreement, dated May 1st, 2003 between Franchisor and Khalid Jamil for the purchase and sale of Shell-branded motor fuel from Franchisor ("Contract"), and (ii) Retail Facility Lease dated May 1st, 2003 between Franchisor and Khalid Jamil, for the Premises (the "Lease"). As you know, you contracted all the rights and obligations under the Contract and the Lease on or about April 28, 2003.

The grounds for termination are as follows: (i) the Franchisee's failure to pay Franchisor in a timely manner when due all sums to which Franchisor is legally entitled, 15 U.S.C. §§2802(b)(2)(C) and 2802(c)(8); and (ii) failure of Franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, 15 U.S.C. §2802 (b)((2)(A).

As you are aware, payment for PRODUCTS delivered to the Premises is due no later than two business days after receipt of the PRODUCTS via EFT. Despite verbal notification from SMO, Inc. to you seeking full payment for products delivered, you have failed to pay. As stated in Purchase and Sale Agreement, "PRODUCTS" are defined as "the gasoline sold to retailer by seller for resale under the brand Identification designated by seller". In addition, you have failed to pay for PRODUCTS received unto Franchisor in a timely manner as stated in the Purchase and Sale Agreement. That is, you failed to pay PRODUCTS in the amount of $21,194.16 for October 21st 2005, $20,296.99 for October 27th 2005, $19,402.66 for November 2nd 2005, $19,623.07 November 4th 2005, $19,404.58 November 5th, and $19,902.29 for November 7th 2005. You are currently in arrears for PRODUCTS received in the amount of $119,823.75. Such failure to make timely payments, or make payments at all, constitutes a breach of a provision of the franchise which is both reasonable and of material significance to the franchise relationship.

Please remit the total payment in the amount of $119,823.75 to SMO no later than the November 16, 2005 by certified or cashier's check in order to prevent legal remedies by SMO, Inc. This letter also serves as a demand that you vacate the Premises immediately. Any personal property remaining on the Premises after November 15th, 2005 will be deemed to be abandoned and will be disposed of by Franchisor accordingly.

This termination is without prejudice to Franchisor's accrued rights. Please contact me at (302) 379-0269 as soon as possible to clear this matter.

A copy of the summary statement described in Section 104(d) [15 U.S.C. Section 2804 (d)] of the Petroleum Marketing Practices Act is enclosed herewith.

SMO, INCORPORATED

By: _____
Richard Miller

Title:   Wholesale Area Manager


Khalid Jamil Refused to sign receipt of documents.

witness _____

witness _____

2

DEPARTMENT OF ENERGY

## Revised Summary of Title I of the Petroleum Marketing Practices Act
(Extracted from the Federal Register, Vol. 61, No. 123, Tuesday, June 25, 1996, 32786-32790)
AGENCY: Department of Energy.

ACTION: Notice.

----------------------------------------------------------------------

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. Secs. 2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to ``company'' operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780.

Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. Sections. 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term ``franchise'' is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.   Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.   Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. Secs. 2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

1. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the

4

Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. Sec. 2802(b)(E).

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power

of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.


II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of

6

franchise relationships.

A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

7

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading ``Notice Requirements for Termination or Nonrenewal.''

V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. Sections 2801-2806.

VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I--Definitions and Legal Remedies

I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

A. Franchise

A ``franchise'' is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use. The term ``franchise'' includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection

8

with the sale, consignment, or distribution of motor fuel.

### D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

### F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

### G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

### II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

### C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals

based on condemnation or destruction of the marketing premises.

D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
    (1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
    (2) To materially alter, add to, or replace such premises;
    (3) To sell such premises;
    (4) To withdraw from marketing activities in the geographic area in which such premises are located; or
    (5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
Marc W. Chupka,
Acting Assistant Secretary for Policy.
[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]